UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMILLA CLARK and ARWA AZIZ, on Behalf of Themselves and Others Similarly Situated, and TURNING POINT FOR WOMEN AND FAMILIES, | |
| Plaintiffs, | No. 18-cv-02334-RWS |
| -against- | |
| CITY OF NEW YORK, | |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## <u>TABLE OF CONTENTS</u>

<u>Page No(s).</u>

PRELIMINARY STATEMENT ....................................................................................1

FACTS ........................................................................................................................1

    Plaintiffs Clark and Aziz Are Forced to Remove Their Hijabs for Booking Photographs........2

    The Policy Negatively Impacts Plaintiff Turning Point ............................................4

    The Policy Is Out of Step with an Evolving National Consensus ............................4

    Plaintiffs File Suit .................................................................................................5

ARGUMENT ...............................................................................................................5

I.      MUNICIPALITIES ARE LIABLE FOR DAMAGES UNDER RLUIPA...................6

II.    THE POLICY VIOLATES THE FREE EXERCISE CLAUSE................................8

        A.    The Court Should Apply a Restrictive Version of Turner Test .................8

        B.    Regardless, the Policy Cannot Survive Rational Basis Review ...............10

III.   THE POLICY VIOLATES NEW YORK'S STATE CONSTITUTION ...................13

        A.    A Private Right of Action Is Necessary to Protect Plaintiffs' Rights ........13

        B.    Plaintiffs Have Alleged a Violation of Article I, Section 3 .......................15

IV.   PLAINTIFFS HAVE INJUNCTIVE AND DECLARATORY STANDING .............15

        A.    Diversion of Turning Point's Resources and the Frustration
            of its Mission.......................................................................................16

            1.    Turning Point Was Injured in Fact.................................. 17

            2.    The City's Arguments Are Unavailing ........................... 19

        B.    Plaintiffs Clark and Aziz Have Injunctive Standing................................21

            1.    The NYPD's Photo Database Is a Continuing Harm.................. 21

            2.    Plaintiffs Plausibly Will Be Subjected to the Policy
               in the Future ................................................................. 24

CONCLUSION........................................................................................................25

i

# TABLE OF AUTHORITIES

**Page No(s).**

**Cases**

*Ackridge v. Aramark Corr. Food Servs.*,
   No. 16 Civ. 6301, 2018 WL 1626175 (S.D.N.Y. Mar. 30, 2018) ............................................ 15

*ACLU v. Clapper*,
   785 F.3d 787 (2d Cir. 2015) ................................................................................................... 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................................. 5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................................. 5

*Benjamin v. Coughlin*,
   905 F.2d 571 (1990) ................................................................................................................ 12

*Benjamin v. Fraser*,
   264 F.3d 175 (2d Cir. 2001) ..................................................................................................... 9

*Brandon v. Schroyer*,
   13 Civ. 0939, 2016 WL 1638242 (N.D.N.Y. Feb. 26, 2016) .................................................... 8

*Brims v. Lt. Tracy*,
   No. 93 Civ. 3233, 1996 WL 153696 (S.D.N.Y. Apr. 3, 1996) ................................................. 9

*Catholic Charities of Diocese of Albany v. Serio*,
   7 N.Y.3d 510 (2006) .......................................................................................................... 14, 15

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017) .............................................................................................. 16, 17

*Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*,
   651 F.3d 1163 (9th Cir. 2011) ............................................................................................... 6, 7

*Citizens for Responsibility & Ethics in Washington v. Trump*,
   276 F. Supp. 3d 174 (S.D.N.Y. 2018) .................................................................................... 20

*City of Los Angeles v. Lyons*,
   461 U.S 95 (1983) ................................................................................................................... 16

*Congregation Rabbinical College of Tartikov, Inc. v. Vill. of Pomona*,
   915 F. Supp. 2d 574 (S.D.N.Y. 2013) ............................................................................... 14, 19

*Contrast Abidor v. Napolitano*,
   990 F. Supp. 2d 260 (E.D.N.Y. 2013) .................................................................................... 23

*Cortlandt St. Recovery Corp. v. Hellas Telecommc'ns, S.a.r.l.*,
   790 F.3d 411 (2d Cir. 2015) ................................................................................................... 15

*Davis v. City of New York*,
   902 F. Supp. 2d 405 (S.D.N.Y. 2012) .................................................................................... 24

*Deshawn E. by Charlotte E. v. Safir,*
   156 F.3d 340 (2d Cir. 1998) ............................................................. 16, 21, 25

*District of Columbia, et al., v. Donald J. Trump,*
   No. 17 Civ. 01596, ECF Dkt. No. 92 ................................................ 20

*Fair Hous. Justice Ctr., Inc. v. Silver Beach Gardens Corp.,*
   No. 10 Civ. 912, 2010 WL 3341907 (S.D.N.Y. Aug. 13, 2010) ........... 18

*Florence v. Board of Chosen Freeholders,*
   566 U.S. 318 (2012) ......................................................................... 9

*Franklin v. Gwinnett Cty. Pub. Sch,*
   503 U.S. 60 (1992) ........................................................................... 6

*Gonzalez v. City of Schenectady,*
   728 F.3d 149 (2d Cir. 2013) ............................................................ 9

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ......................................................................... 16, 18

*Holland v. Goord,*
   758 F.3d 215 (2d Cir. 2014) ............................................................ 7

*J.H. v. Bratton,*
   248 F. Supp. 3d 401 (E.D.N.Y. 2017) ............................................... 11, 14, 15

*Jana-Rock Const., Inc. v. New York State Dept. of Econ. Dev.,*
   438 F.3d 195 (2d Cir. 2006) ............................................................ 12

*Janfeshan v. U.S. Customs and Border Protection,*
   No. 16 Civ. 6915, 2017 WL 3972461 (E.D.N.Y. Aug. 21, 2017) ......... 22, 23

*Kachalsky v. Cacace,*
   817 F. Supp. 2d 235 (S.D.N.Y. 2011 ................................................ 22, 24

*Keaton v. Ponte,*
   16 Civ. 3063, 2017 WL 3382314 (S.D.N.Y. Aug. 4, 2017) .................. 8

*Kelley Bey v. Keen,*
   No. 13 Civ. 1942, 2014 WL 3563475 (M.D. Pa. Jul. 17, 2014) ........... 6

*Kingsley v. Hendrickson,*
   135 S. Ct. 2466 (2015) ................................................................... 9

*Lake v. Howell,*
   No. 12 Civ. 2018, 2015 WL 13260402 (N.D. Ga. 2015),
   *rev'd in part on other grounds by Lake v. Skelton,*
   840 F.3d 1334 (11th Cir. 2016) ....................................................... 6

*Laumann v. Nat'l Hockey League,*
   105 F.Supp.3d 384 (S.D.N.Y. 2015) ................................................ 23

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,*
   510 F.3d 253 (3d Cir. 2007) ............................................................ 6

*Loccenitt v. City of N.Y.*,
   12 Civ. 948, 2012 WL 5278553 (S.D.N.Y. Mar. 15, 2013) ..................................................... 8

*Lopez v. Cipolini*,
   136 F. Supp. 3d 570 (S.D.N.Y. 2015) ....................................................................................... 7

*Lopez v. Jet Blue Airways*,
   662 F.3d 593 (2d Cir. 2011) ...................................................................................................... 6

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................................................ 16, 17

*Martinez v. City of Schenectady*,
   97 N.Y.2d 78 (2d Circ. 2001) .................................................................................................. 14

*Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*,
   519 F. Appx. 714 (2d Cir. 2013)............................................................................................... 19

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977).................................................................................................................... 7

*N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012) ........................................................................................ 18, 19, 20

*Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*,
   723 F.3d 192 (2d Cir. 2013) ...................................................................................................... 6

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011) ............................................................................ 16, 17, 18, 19

*O'Shea v. Littleton*,
   414 U.S. 488 (1974).................................................................................................................. 21

*Opulent Life Church v. City of Holly Springs Miss.*,
   697 F.3d 279 (5th Cir. 2012) ................................................................................................. 6, 7

*Powell v. City of New York*,
   14 Civ. 09937 (PAC) (BCM), 2016 WL 4159897 (S.D.N.Y. Jul. 14, 2016),
   *report and recommendation adopted by* 2016 WL 147203 (S.D.N.Y. Aug. 3, 2016) .............. 8

*Ragin v. Harry Macklowe Real Estate Co.*,
   6 F.3d 898 (2d Cir. 1993) .................................................................................................. 16, 18

*Ramrattan v. Fischer*,
   No. 13 Civ. 6890, 2015 WL 3604242 (S.D.N.Y. Jun 9, 2015) ................................................. 8

*Salahuddin v. Goord*,
   467 F.3d 263 (2d Cir. 2006) ...................................................................................................... 8

*Shepard v. Fisher*,
   08 Civ. 9297, 2017 WL 666213 (S.D.N.Y. Feb. 16, 2017)....................................................... 7

*Soliman v. City of New York*,
   15 Civ. 5310, 2017 WL 1229730 (E.D.N.Y. Mar. 31, 2017)........................................... 11, 14

*Sossamon v. Texas*,
   563 U.S. 277 (2011).................................................................................................................... 7

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1988) ............................................................................... 21

*Toney-Dick v. Doar,*
  12 Civ. 9162, 2013 WL 5295221 (S.D.N.Y. 2013) ............................... 23

*Town of Islip v. Caviglia,*
  141 A.D.2d 148 (2d Dep't 1988) .......................................................... 14

*Turner v. Safley,*
  482 U.S. 78 (1987) ...................................................................... 8, 9, 10

*Valdez v. City of New York,*
  2013 WL 8642169 (S.D.N.Y. Sep. 3, 2013) .......................................... 10

*Washington v. Gonyea,*
  731 F.3d 143 (2d Cir. 2013) ................................................................... 7

*Whitley v. Albers,*
  475 U.S. 312 (1986) ................................................................................ 9

*Zargary v. City of New York,*
  607 F. Supp. 2d 609 (S.D.N.Y. 2009),
  *aff'd*, 412 F. App'x 339 (2d Cir. 2011) ............................. 10, 12, 13, 15

## Other Authorities

N.Y. Const. Art. 1, § 3 ............................................................................ 13, 14

NYPD Patrol Guide 208-03 ....................................................................... 1, 2

NYPD Patrol Guide 208-07 ........................................................................... 2

## PRELIMINARY STATEMENT

New York City's maximalist mug-shot policy—requiring the complete removal of religious head coverings that do not obscure an arrestee's face—is contrary to the state and federal constitutions and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). This class-action lawsuit seeks compensation for the emotional damages caused by this policy and declaratory and injunctive relief to prevent its continued implementation.

After their arrests on bogus charges, the NYPD forced Plaintiffs Arwa Aziz and Jamilla Clark to remove their hijabs—religious head coverings worn by Muslim-American women that cover the hair but leave the entire face exposed—for mug shots. Ms. Aziz and Ms. Clark cried, pleaded, and explained their sincerely-held belief in wearing the hijab in public. In response, NYPD Officers threatened the women with processing delay and even criminal charges if they did not submit. Now, photographs of Ms. Clark and Ms. Aziz, "uncovered" against their will, remain in the NYPD's database forever, available to employees and the public at large.

The NYPD's formal policy to force the removal of all religious head coverings for every mug shot is unnecessary, overbroad, discriminatory, and out of step with an evolving national consensus. This case does not challenge the City's interest in taking a photograph of an arrestee's face. Instead, it challenges the Policy's requirement that photographs go beyond capturing the face of an arrestee to require the removal of religious head coverings. This Policy targets the religiously observant without any legitimate interest and violates RLUIPA and the federal and state free exercise clauses. And each of the individual and institutional plaintiffs have standing to challenge it.

## FACTS

NYPD policy requires the removal of religious head coverings for mug shots (the "Policy"). The NYPD Patrol Guide 208-03, "Arrests – General Processing," was amended in

March 2015 pursuant to Interim Order 29 to require such removal. The Policy dictates that, where an arrestee indicates a preference to retain their head covering for a mug shot, the prisoner must be transported to One Police Plaza, where "the arrestee will have an official Department picture taken without their religious head covering." *Id.* ¶ 36(b). According to the Policy, a "member of the service of the same gender [as the arrestee]" must be available to take the photograph. *Id.* ¶ 36(c).

Patrol Guide Section 208-07 was also amended to similar effect, and notes that arrestees who are transported to One Police Plaza "will be informed that their arrest processing may be delayed due to operational requirements." Compl. ¶ 28. The resulting mug shots, or booking photographs, which depict arrestees *without* religious head coverings, are used by other law enforcement databases, including those that implement facial recognition software. *Id.*

Sections 208-03 and 208-07 are bright-line rules: they apply to all arrestees, without exception. An arrestee whose religion is offended by the Policy as written has no recourse. The Policy nowhere explains why it is necessary to completely remove a religious head covering for a mug shot. And it is not uniformly applied. At least one woman has been arrested and forced to remove her hijab without the opportunity to go to One Police Plaza. *Id.* ¶ 32.

**Plaintiffs Clark and Aziz Are Forced to Remove Their Hijabs for Booking Photographs**

On January 9, 2017, Plaintiff Jamilla Clark was arrested for violation of a protective order fabricated by her abusive ex-husband. Compl. ¶ 52. Ms. Clark informed NYPD officers that, as a practicing Muslim, she could not be physically contacted by men and was required to wear her hijab—a garment worn by many Muslim and Muslim-American women that covers the ears, hair, and neck, but leaves the entire face exposed—at all times. *Id.* ¶¶ 53, 16. Ms. Clark wears a hijab because she believes her faith dictates that no man outside of a woman's immediate

family, or *mahram*, should see her uncovered hair, head, and neck, and presently "covers" every single day. *Id.* ¶ 19. Requiring a Muslim woman to remove her hijab in public is akin to demanding that a secular person strip naked in front of strangers. *Id.* ¶ 20. It is a profound defilement of the wearer's sincerely-held religious beliefs. *Id.*

Despite Ms. Clark's explanation of her religious beliefs, officers at NYPD Central Booking ordered Ms. Clark to remove her hijab for a mug shot. *Id.* ¶ 54. Ms. Clark reiterated that her faith prevented her from removing her hijab in front of men outside her *mahram*. *Id.* Officers informed Ms. Clark that she would be prosecuted if she did not remove her hijab, and one supervisor made hostile comments about Muslims. *Id.* Later, Ms. Clark was transported to One Police Plaza, where—fearful of criminal charges—she removed her hijab to be photographed in a private room. *Id.* ¶ 55. Ms. Clark observed a surveillance camera in the room, and the female officer who photographed her showed the picture to approximately five male officers. *Id.* Male officers also touched Ms. Clark repeatedly despite her protestations. *Id.*

The forced removal of Ms. Clark's hijab left her agitated, distraught, and in tears. *Id.* ¶ 56. Because the NYPD still has her mug shot, Ms. Clark is haunted by the prospect that men outside her *mahram* may view the image again and again, indefinitely. *Id.* ¶ 57.

On August 30, 2017, Plaintiff Arwa Aziz voluntarily submitted herself to NYPD custody after her sister-in-law obtained a bogus protective order. *Id.* ¶ 58. Ms. Aziz wears her hijab daily and believes her faith requires as much; it is an essential part of who she is. *Id.* ¶ 19. At Brooklyn Central Booking, in a hallway with dozens of male prisoners, male officers demanded that Ms. Aziz remove her hijab to be photographed. *Id.* ¶ 59. One officer said, "Does she know she has to take her hijab off?" *Id.* Ms. Aziz said she could not remove her hijab for religious reasons. *Id.* ¶ 60. The officers told Ms. Aziz she could have her picture taken privately at One Police Plaza,

but warned her a female photographer might not be available, and threatened to "restart" the booking process if she chose to relocate. *Id.*

Having waited for close to one hour, Ms. Aziz asked the officers if she could push her hijab back to reveal her bangs and hairline for the photo. *Id.* ¶ 61. Again, the officers refused. *Id.* They again directed Ms. Aziz to remove her hijab entirely. *Id.* In tears, Ms. Aziz finally complied. *Id.* ¶ 62. For five minutes, officers photographed Ms. Aziz from the front and in profile, prolonging the amount of time Ms. Aziz went uncovered. *Id.* While some male prisoners in the hallway turned away to afford Ms. Aziz some privacy, the officers did not. *Id.*

Like Ms. Clark, Ms. Aziz has suffered lasting trauma because of the forced removal of her hijab, amplified by the ongoing maintenance and distribution of the photos. *Id.* ¶¶ 63, 65.

**The Policy Negatively Impacts Plaintiff Turning Point**

The Policy also harms Plaintiff Turning Point for Women and Families ("Turning Point"), a non-profit organization based in Queens County that advocates for Muslim women and girls who have been the victims of domestic violence. *Id.* ¶¶ 48-49. Turning Point accomplishes this objective through direct services, advocacy, and referrals, among other methods. *Id.* The Policy, which disregards the religious rights of Muslim-Americans, frustrates Turning Point's mission to protect the legal rights of members of that community. *Id.* ¶ 50. To combat the effects of the Policy, Turning Point diverted its limited resources in a variety of respects, and is in the process of planning future remedial measures. *Id.* ¶ 49.

**The Policy Is Out of Step with an Evolving National Consensus**

Unlike the NYPD, other government and law enforcement entities across the country—recognizing the significant constitutional and statutory interests at play—permit those in custody to wear religious head coverings in official photographs. *Id.* ¶ 33.

4

Numerous law enforcement entities—including those in Dearborn Heights, Michigan; Long Beach, California; Hennepin County, Minnesota; and Portland, Maine—have changed their procedures to permit the retention of religious head coverings for mug shots. *See id.* ¶¶ 37-43.

Federally, the United States Department of State permits the retention of religious head coverings in passport photographs. *Id.* ¶ 34. The same is true of the United States Citizenship and Immigration Services' official photographs. *Id.* ¶ 35. To accommodate the photographed, that organization will merely "ask an individual to remove or adjust portions of religious headwear that covers all or part of the individual's face," and will offer the wearer a private area to adjust the covering and a photographer of their gender. *Id.*

The New York State Department of Motor Vehicles likewise permits an applicant for a drivers' license to retain her hijab for the license photograph. *Id.* ¶ 36.

**Plaintiffs File Suit**

On March 16, 2018, Plaintiffs Clark and Aziz (along with Turning Point) filed suit pursuant to Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(3), on behalf of themselves and other individuals similarly situated. Plaintiffs allege violations of RLUIPA and the federal and state free exercise clauses. Plaintiffs seek an injunction barring the removal of any religious head covering for post-arrest photographs and monetary relief for the named Plaintiffs, the alleged class, and Turning Point.

The City moved to dismiss the Complaint on June 13, 2018. *See* ECF Dkt. No. 22.

## ARGUMENT

Under Federal Rule 12(b)(6), a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 697 (2009). "To be plausible, the complaint need not show a probability of plaintiff's success," but need only "evidence more than a mere possibility of a

right to relief." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013). The Court must accept as true the complaint's well-pleaded factual allegations and draw all reasonable inferences in the Plaintiffs' favor. *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011). The Complaint satisfies this standard; the City's motion should be denied.[1]

## I.   MUNICIPALITIES ARE LIABLE FOR DAMAGES UNDER RLUIPA

It is well-established that money damages are available against municipalities—and municipal employees in their official capacities—that violate RLUIPA. *See Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279, 290 (5th Cir. 2012) ("[M]oney damages are available under RLUIPA against political subdivisions of states, such as municipalities and counties."); *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1168-69 (9th Cir. 2011) ("municipalities are liable for money damages for violations of RLUIPA"); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 260-61 (3d Cir. 2007) (permitting claim for compensatory damages under RLUIPA to proceed against municipality); *Lake v. Howell*, No. 12 Civ. 2018, 2015 WL 13260402, at *9 (N.D. Ga. 2015) ("political subdivisions of states such as counties or municipalities can be liable for money damages" under RLUIPA), *rev'd in part on other grounds by Lake v. Skelton*, 840 F.3d 1334 (11th Cir. 2016); *Kelley Bey v. Keen*, No. 13 Civ. 1942, 2014 WL 3563475, at *13 (M.D. Pa. Jul. 17, 2014) (holding that Eleventh Amendment did not bar official capacity claim against municipal officials); *see also Franklin v. Gwinnett Cty. Pub. Sch*, 503 U.S. 60, 70-71 (1992) (money damages are available against municipal entities "absent clear direction to the contrary by Congress").

---

[1] Plaintiffs do not dispute that Plaintiff Aziz's state law claim for compensatory damages on behalf of herself must be dismissed—without prejudice—for an untimely notice of claim (Opp. Point IV). Plaintiff Aziz will seek leave to file a late notice of claim and, if permitted to do so, will reassert her state law claim for compensatory damages. Nor do Plaintiffs dispute that punitive damages are unavailable against the City pursuant to Point V. *See* Opp. 19-20.

The City erroneously relies on a line of inapposite cases holding that compensatory damages under RLUIPA are not available against *States* or State officials. But *Sossamon v. Texas*, 563 U.S. 277 (2011), and its progeny rely exclusively on a sovereign immunity analysis from which municipal entities, like the City, do not benefit. *See, e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81 (1977) (political subdivisions of States do not enjoy Eleventh Amendment immunity). In *Sossamon*, the Supreme Court concluded that RLUIPA did not "clearly and unequivocally" waive sovereign immunity under the Eleventh Amendment from suits for money damages. *Sossamon*, 563 U.S. at 285-86; *see also, e.g.*, *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014); *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013) (per curiam). "Thus, municipalities and counties may be held liable for money damages under RLUIPA, but states may not." *Opulent Life Church*, 697 F.3d at 290; *see also City of Yuma*, 651 F.3d at 1168-69 (because the Eleventh Amendment "does not apply to municipalities," the City of Yuma "may be liable for monetary damages under RLUIPA").

The City's blanket declaration that money damages are *never* available under RLUIPA ignores the distinction between State and municipal entities.[2] *See* City. Opp. at 4. None of the cases the City cites in support of this erroneous proposition justifies dismissal of Plaintiff's claim for compensatory relief under RLUIPA. The City invokes cases that *correctly* dismiss RLUIPA damages claims against *State* entities, but they have no application here.[3] They do not apply to municipalities, which, as explained above, can take no refuge in the Eleventh Amendment.

The City also leans on cases that *wrongly* dismissed RLUIPA claims for money damages

---

[2] The City relatedly claims, without support, that "if monetary damages are unavailable as against an individual in an official capacity suit, they are similarly unavailable against the governmental entity under RLUIPA." Opp. at 4 n.3. This is true, of course, as to RLUIPA claims for money damages against *States*. But such claims are viable as against municipalities and against municipal officials in their official capacity, as the cases cited above make clear.
[3] *See Holland*, 758 F.3d at 224; *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 589 (S.D.N.Y. 2015); *Shepard v. Fisher*, 08 Civ. 9297, 2017 WL 666213, at *31 (S.D.N.Y. Feb. 16, 2017).

against municipal entities, but cite only *State*-specific authority. These cases are equally inapposite. Insofar as they purport to deem money damages categorically unavailable under RLUIPA, they are wrong as a matter of law and should not govern this Court's analysis.[4]

The City's would-be blanket prohibition on money damages under RLUIPA finds no succor in the statute or in precedent. Plaintiffs' RLUIPA damages claims should proceed.

## II.   THE POLICY VIOLATES THE FREE EXERCISE CLAUSE

Because the Policy bears no reasonable relationship to the City's alleged security interest, and because there are alternative means of facilitating Plaintiffs' Free Exercise rights that would have merely a *de minimis* effect on those interests, the Policy cannot survive rational basis review under the factors set forth in *Turner v. Safley*, 482 U.S. 78, 84 (1987): whether (i) the asserted government objective is legitimate; (ii) the relationship between that objective and the challenged policy is reasonable; (iii) the accommodation of the right will impact government personnel; and (iv) there are alternative means of exercising the right that would have only a *de minimis* effect on the asserted government objective.

### A.   The Court Should Apply a Restrictive Version of Turner Test

In assessing the Policy's relationship to the City's interests in photographing arrestees, the Court should apply a more stringent version of the forgiving reasonableness test traditionally applied to inmates' claims. *See Turner*, 482 U.S. at 84; *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006). This standard would account for the fundamental distinction between those who have already been convicted and sentenced and those who have not, and it would recognize the City's post-arrest interests are less pressing than its incarceration interests.

---

[4] *See Powell v. City of New York*, 14 Civ. 09937, 2016 WL 4159897, at *7 (S.D.N.Y. Jul. 14, 2016), *report and recommendation adopted by* 2016 WL 147203 (S.D.N.Y. Aug. 3, 2016); *Keaton v. Ponte*, 16 Civ. 3063, 2017 WL 3382314, at *9 (S.D.N.Y. Aug. 4, 2017); *Loccenitt v. City of N.Y.*, 12 Civ. 948, 2012 WL 5278553, at *6 (S.D.N.Y. Mar. 15, 2013); *Ramrattan v. Fischer*, No. 13 Civ. 6890, 2015 WL 3604242, at *8-*9 (S.D.N.Y. Jun 9, 2015); *Brandon v. Schroyer*, 13 Civ. 0939, 2016 WL 1638242, at *9 (N.D.N.Y. Feb. 26, 2016).

As the Supreme Court has held for decades, pretrial detainees and other persons not yet convicted, sentenced, and incarcerated have constitutional rights that prison inmates do not.[5] Here, Plaintiffs Clark and Aziz *had not even been arraigned* when the Policy was applied to them. Arrestees retain even greater constitutional rights than pretrial detainees.

A strict application of *Turner* is particularly warranted because the City's interests in security and identification at Central Booking are *not* identical to those interests at Rikers Island and long-term detention facilities. *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012)—the City's only authority on this point—is not to the contrary. There, the Supreme Court deemed an invasive strip-search policy applicable to any person in a "detention center," regardless of the center's size. *Id.* at 328-29. The Court held that the Fourth Amendment did not prohibit this blanket practice in light of the "undoubted security imperatives" at play—namely, deterring attempts to sneak contraband into facilities. *Id.* at 330.

Even insofar as security interests across different detention facilities are coextensive for purposes of the Fourth Amendment, therefore, they are *not* coextensive when it comes to photograph policies that encroach on religious freedom. *Florence* is inapposite. Plaintiffs do not challenge the City's search procedures or its methods of preventing contraband from entering booking centers or precincts. They challenge the forced removal of head coverings for an identifying photograph. Neither *Florence* nor its Second Circuit progeny purported to address this question. *See, e.g.*, *Gonzalez v. City of Schenectady*, 728 F.3d 149, 161-62 (2d Cir. 2013) (addressing strip searches conducted without reasonable suspicion of wrongdoing).

---

[5] *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, 327 (1986) (distinguishing between the due process protections afforded "prison inmates" as opposed to "pretrial detainees or persons enjoying unrestricted liberty"); *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015) (distinguishing between the Fourteenth Amendment rights of pretrial detainees and the Eighth Amendment rights of convicted prisoners), *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001) ("A detainee's interest in freedom from unjustified infliction of pain and injury is more substantial [than an inmate's.]"); *Brims v. Lt. Tracy*, No. 93 Civ. 3233, 1996 WL 153696, at *3 (S.D.N.Y. Apr. 3, 1996) ("A pretrial detainee, however, has not yet been convicted or sentenced, and hence his or her expectations of 'ordinary' prison life are different from those of a convicted inmate.").

Given the distinction between arrestees and inmates and the City's diminished interests at Central Booking, a more stringent standard of review for the Policy is warranted. The degree of deference typically due in the penological context would be improper if applied to policies governing mere post-arrest detention. "[T]hose in different contexts require the application of different legal standards." *Valdez v. City of New York*, 2013 WL 8642169, at *8 n.5 (S.D.N.Y. Sep. 3, 2013); *see also Zargary v. City of New York*, 607 F. Supp. 2d 609, 613 (S.D.N.Y. 2009), *aff'd*, 412 F. App'x 339, 341-342 (2d Cir. 2011) (applying a "reasonableness test *less* restrictive than that ordinarily applied" because "the challenged regulation is penological and because plaintiff was an inmate when the regulation was applied to her") (emphasis added).

## B.      Regardless, the Policy Cannot Survive Rational Basis Review

Even if this Court applies the most relaxed iteration of *Turner*, the Policy cannot survive reasonableness analysis. There is no rational relationship between the forced removal of religious head coverings for mug shots and the City's interest in identifying arrestees. While the City has at least some interest in maintaining a photographic record of arrestees, *see* Opp. at 13, the Policy fails to satisfy the remaining three factors.

The City does not dispute that arrestees like Plaintiffs Aziz and Clark have no "alternative means of exercising" their right to wear a hijab at all times in public. *See Turner*, 482 U.S. at 84. Nor does the City claim that permitting arrestees to retain their religious head coverings while photographed will burden guards, other arrestees, or prison resources. *See id.* For good reason. It is more burdensome to require dialogue with arrestees and additional time spent negotiating removal than to photograph arrestees with their preferred coverings.

Finally, and crucially, the City can establish no rational relationship between the Policy and its stated interest in identification. There is no legitimate need for a photograph *without a religious head covering*, as opposed to a photograph *with* one. The only differences—an

10

arrestee's hair and ears—involve features far less essential to identification than other facial characteristics. The City frets that, "without the ease of a ready identification, inmates could trade clothes and change their appearance." Opp. at 16. But "ready identification" does not require the coerced removal of a religious garment, and forcing arrestees to doff head coverings does not rationally contribute to the NYPD's interest in accurately identifying inmates given the numerous other ways arrestees can modify their appearances.

For instance, arrestees who do *not* wear hair coverings could nevertheless alter hairstyles, remove or add spectacles or facial jewelry, or rearrange their clothing to change their appearances to escape identification by police personnel. In response, the City could rationally (1) bar *any* changes in physical appearance and/or (2) monitor arrestees closely to prevent such changes without running afoul of the First Amendment. Conversely, a policy that requires an arrestee to change her ordinary appearance *before* she is photographed (*i.e.*, remove the hijab she customarily wears, will replace immediately after she is photographed, and plans to wear while in custody) may *impede* the NYPD's interest in identifying inmates efficiently. Nor is it rational to have only religious arrestees change their looks. The Court in *Soliman v. City of New York* and *J.H. v. Bratton*, on which the City relies, did not address these arguments. *See J.H.*, 248 F. Supp. 3d 401, 414 (E.D.N.Y. 2017); *Soliman*, 15 Civ. 5310, 2017 WL 1229730, at *8-*9 (E.D.N.Y. Mar. 31, 2017). Insofar as those cases uphold a policy of removal without articulating the policy's relationship to the City's interest, they should not govern this Court's analysis.

Permitting Plaintiffs to retain their head coverings for mug shots would have no more than a *de minimis* impact on the City's alleged interest. The City claims, without citation or analysis, that "this alternative would frustrate the City's legitimate interest in having a photographic record of arrestees from which a later identification can be made." Opp. at 14. But

11

it does not explain *how* a photograph depicting an arrestee wearing a head covering—as he or she ordinarily does—would impede identification. It would not. Insofar as maintaining photographs of arrestees with head coverings can be said to have *any* detrimental effect on the City's maintenance of Booking Centers, that effect is constitutionally insignificant, especially given that hijabs can be "pulled back" to reveal the entire oval of an arrestee's face. *See, e.g.*, *Benjamin v. Coughlin*, 905 F.2d 571, 576-77 (1990) (tying hair of Rastafarian inmates back to "reveal his facial features properly" "adequately accommodates the interest of prison authorities in revealing an inmate's cranial and facial features" and has no more than "a de minimis effect on valid penological interests"). The City cites no contrary authority.

Other law enforcement and government agencies recognize that identification interests are well-served by photographs depicting persons with their preferred religious head coverings. Law enforcement agencies from California to Maine have amended their booking procedures to permit head coverings in mug shots. Compl. ¶¶ 37-43. The Department of State permits them in passport photographs. *Id.* ¶ 34. Likewise for USCIS's official photographs, *id.* ¶ 35, and the New York DMV's driver's license photographs, *id.* ¶ 36. And the Policy is unreasonable given the growing consensus that head coverings do not impede police interests.

The City cites *Zargary* for the proposition that the Policy is not "irrational or invalid" because there are "other ways for an inmate to change her facial appearance" apart from removing a head covering. Opp. at 15 (citing *Zargary*, 607 F. Supp. at 613). This feeble distinction renders rational basis review—concededly forgiving—utterly toothless. "Underinclusive remedial measures are doubtless open to constitutional attack when they are irrational." *Jana-Rock Const., Inc. v. New York State Dept. of Econ. Dev.*, 438 F.3d 195, 212 (2d Cir. 2006). Just so here. The NYPD's purported concerns regarding identification do not

12

justify a policy that targets only those who are religiously observant. The relaxed nature of rational basis does not excuse discrimination. In any event, *Zargary*—which concerned "security at correctional facilities" for convicted, sentenced inmates—does not govern the post-arrest booking scenario at issue here. *See supra* Part II.A.1.

Even had the City applied its Policy correctly—which it did not—the Policy would *still* fail to accommodate Plaintiffs' religious beliefs. As outlined above, Plaintiffs' injuries go beyond the forced removal of their head coverings for the time that the mug shot is taken (though that is harm enough). Plaintiffs suffered that initial humiliation *plus* the continued adverse effects of the City's retention and distribution of the uncovered photo. *See infra* Part IV.B.1.

Nor can the City claim that the current policy "recognizes and accommodates the sincerely-held religious beliefs of arrestees who wear religious head coverings," as the allegations of Plaintiff Clark and Aziz make clear. Opp. at 11. The City did not apply the Policy as written to either Plaintiff. While Ms. Clark's photograph was taken in a private room, there was a surveillance camera in that room, the photograph was immediately shown to approximately five male NYPD officers, and male officers touched Ms. Clark repeatedly despite her requests otherwise. Compl. ¶ 55. And after NYPD officers warned Ms. Aziz that requesting a female photographer might "restart" her booking process, she declined. *Id.* ¶ 60.

## III.    THE POLICY VIOLATES NEW YORK'S STATE CONSTITUTION

Plaintiffs have a private right of action under the New York State Constitution and the Policy violates Plaintiffs' "free exercise and enjoyment of religious profession and worship." N.Y. Const. Art. 1, § 3.

### A.    A Private Right of Action Is Necessary to Protect Plaintiffs' Rights

A private right of action exists under the New York Constitution where it is "necessary to effectuate the purpose of the constitutional protections the plaintiff invokes" and "appropriate to

ensure full realization of [plaintiff's] rights." *Soliman,* 2017 WL 1229730, at *8. The Court of Appeals has declared the New York State Constitution "more protective of religious exercise" than the Federal Constitution. *Catholic Charities of Diocese of Albany v. Serio*, 7 N.Y.3d 510, 525 (2006); *see also Town of Islip v. Caviglia*, 141 A.D.2d 148, 161 (2d Dep't 1988). Relief under the federal constitution is therefore *not* an "adequate alternative remed[y]" to a cause of action under Art. I, § 3.

What is more, no court has addressed whether the scope of New York's Art. 1, Sec. 3 provides protections comparable to those enshrined in RLUIPA. Until that question is squarely addressed, this Court should not reject Plaintiffs' state constitutional claim solely because other remedies are purportedly available. To so hold would eradicate the distinctions between the New York Constitution and federal law and impede the "full realization" of Plaintiffs' religious free exercise rights. *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 83 (2d Circ. 2001). This is especially so on a motion to dismiss, as the nature of the burden on their religious rights have yet to be fleshed out in discovery.

Precisely because "the New York Constitution creates rights and protections that are independent from" those available elsewhere, one district judge has twice refused to dismiss claims under Art. I, Section 3, noting that cases to the contrary "do not identify any basis in New York law to deny a right of action under the New York Constitution based on remedies that may be obtainable under federal law." *J.H.*, 248 F. Supp. 3d at 414 (denying motion to dismiss claim for religious discrimination under Art. 1, Sec. 3); *Soliman*, 2017 WL 1229730, at *8-*9 (same); *Congregation Rabbinical College of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 593 (S.D.N.Y. 2013) (concluding defendants violated Art. 1, Sec. 3 and implicitly assuming a private right of action exists); *see also Ackridge v. Aramark Corr. Food Servs.*, No. 16 Civ. 6301, 2018

WL 1626175, at \*22 (S.D.N.Y. Mar. 30, 2018) (denying motion to dismiss Art. I, Sec. 3 claim and implicitly assuming a private right of action exists). This Court should do the same.

### B.  Plaintiffs Have Alleged a Violation of Article I, Section 3

For all the reasons outlined above, *see supra* Part II.B, Plaintiffs have stated a claim under Article I, Section 3 of the New York State Constitution. The Policy is an "unreasonable interference" with their religious freedom: it does not serve any legitimate City interest and directly impedes Plaintiffs' sincerely-held belief that they must wear their hijabs at all times in public. *Catholic Charities*, 7 N.Y.2d at 525; *see also Ackridge*, 2018 WL 1626175, at \*22 (finding violation of Article I, Section 3 "[f]or the same reasons the Court found the allegations sufficient to state a violation of Plaintiff's Free Exercise rights for the delay of kosher meals and lack of regular Jewish religious services"). Whatever "deference" is due the City does not absolve it from showing a reasonable relationship between its policies and some legitimate interest. *Catholic Charities*, 6 N.Y.2d at 525. This is especially so because the state free exercise clause is "more protective of religious exercise" than its federal counterpart. *See id.*[6]

The Court should allow Plaintiffs' state constitutional claim to proceed.

## IV.  PLAINTIFFS HAVE INJUNCTIVE AND DECLARATORY STANDING

Each of the Plaintiffs has standing to pursue injunctive and declaratory relief. *Cortlandt St. Recovery Corp. v. Hellas Telecommc'ns, S.a.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015). Turning Point diverted its resources to combat the Policy, which frustrated Turning Point's mission to protect the rights of Muslim women and girls. Plaintiffs Aziz and Clark experience ongoing injury from the City's photos and are likely to be subjected to the Policy in the future.

---

[6] The single case the City marshals against Plaintiff's state free exercise claim is *Zargary*. Opp. at 18. But *Zargary* applied only *federal* law, and did not purport to address the New York State Constitution. *See* 607 F. Supp. 2d at 610. "Defendant[] do[es] not cite any [state] caselaw on this issue, nor [does it] explain how the facts [it] assert[s], if proven, would defeat a claim of religious discrimination under this provision of the New York Constitution." *J.H.*, 248 F. Supp. 3d at 415 (denying motion to dismiss claim under Art. I, Section 3).

### A.    Diversion of Turning Point's Resources and the Frustration of its Mission

Turning Point may bring a § 1983 suit on its own behalf if it "can independently satisfy the requirements of Article III standing": the organization must itself have suffered (1) a "distinct and palpable" "injury in fact" that is (2) "fairly traceable" to the challenged action and (3) likely redressable by a favorable decision. *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011). To establish injury-in-fact, an organization need show "only a perceptible impairment" of its activities via diversion of resources or frustration of mission. *Id.* at 157; *see also Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). "And, where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017). Such injury cannot be abstract, but it may be "scant," *Nnebe*, 644 F.3d at 156-57, and is established if an organization has "spent money to combat" a policy that harms its "core activities," *Centro*, 868 F.3d at 111.

"At the pleading stage, general factual allegations of injury resulting from the defendants' conduct may suffice, [since] on a motion to dismiss [the court] presume[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation and quotation marks omitted).

The City contests only whether the injuries Turning Point alleges qualify as "injury-in-fact" for purposes of Article III standing.[7]

---

[7] The City does not contest that those injuries are "fairly traceable" to the NYPD's conduct or that they can be redressed by a favorable ruling. *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (citing *City of Los Angeles v. Lyons*, 461 U.S 95, 105-06 (1983)). In any event, Turning Point meets all three requirements.

16

1.   Turning Point Was Injured in Fact

Turning Point has been injured by diverting its limited resources to address the Policy. It turned its attention away from its ordinary, core activities to "respond to allegations by its members that they had been forced to remove their hijabs for the Booking Photograph while in custody and that the Photograph had violated their constitutional and statutory rights." Compl. ¶ 49. The resources Turning Point devoted to the Policy include (1) staff time to obtain information from clients; (2) counseling services for clients who had been subjected to the Policy; (3) reviewing relevant documents concerning the Policy; (4) analyzing the results of the investigation of the Policy and information from its constituents; (5) meeting with Executive staff, Board members, and legal counsel; and (6) ongoing client communication. *See id.* In addition to these activities, Turning Point diverts resources on an ongoing basis to plan future remedial measures, including youth outreach and a "Know Your Rights" campaign. *See id*.

These categories of diversion more than suffice to show a "perceptible impairment" of Turning Point's activities, *Nnebe*, 644 F.3d at 156-57, and that the organization has "spent money to combat" the Policy, *Centro*, 868 F.3d at 111. No more is required at the pleading stage. *See Lujan*, 504 U.S. at 561.

The Policy also frustrated Turning Point's mission to protect the legal rights of Muslim women and girls, particularly those who have been victims of intimate partner violence. Compl. ¶¶ 12, 50. The Policy ignores the sincere religious interest of Muslim women in retaining their hijabs—an interest Turning Point works diligently to protect. *Id.* ¶ 50. The NYPD's disregard for religious free exercise, particularly among already-vulnerable communities of Muslim-American women, contravenes Turning Point's policy goals and impedes its activism. *Id.* Courts frequently

grant organizational standing under analogous circumstances.[8]

For example, in *Havens*, the seminal Supreme Court case on this issue, the Supreme Court found that a fair housing group had standing to sue a real estate company allegedly engaged in racial steering because the defendant's conduct "perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers," which was part of the fair housing group's mission. *Havens*, 455 U.S. at 379. And in *Nnebe*, the Second Circuit found standing to challenge a taxicab licensing policy where the organization expended resources to counsel cab drivers facing suspension, explain licensing rules to them, and assist in procuring counsel. 644 F.3d at 157; *see also Ragin*, 6 F.3d at 901-02 (organizational standing where its staff "devoted substantial blocks of time to investigating and attempting to remedy the defendants' advertisements," which "prevented them from devoting their time and energies to other . . . matters"); *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 289 (2d Cir. 2012) (standing to challenge policy that impeded advocacy efforts).

Turning Point's claim for standing is on all fours with those granted above. Turning Point's staff members have "devoted substantial blocks of time to investigating and attempting to remedy" the Policy. *See Ragin*, 6 F.3d at 901-02. They have counseled constituents about the meaning and impact of the Policy. *See Nnebe*, 644 F.3d at 157. And the Policy has raised the cost to Turning Point of carrying out its mission, *see NYCLU*, 684 F.3d at 289, and diverted Turning Point's attention and resources away from core activities like "education and training," *Mental*

---

[8] Inexplicably, the City does not even acknowledge that frustration of mission is a category of organizational damages sufficient to showing injury-in-fact. *See, e.g.*, *Fair Hous. Justice Ctr., Inc. v. Silver Beach Gardens Corp.*, No. 10 Civ. 912, 2010 WL 3341907, at *7 (S.D.N.Y. Aug. 13, 2010) ("[F]rustration of Plaintiff's mission is the type of injury held to be sufficient by the Supreme Court and the Second Circuit to demonstrate the injury in fact element of organizational standing."); *Havens*, 455 U.S. at 363 (upholding standing under Fair Housing Act where organization was "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing").

*Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. Appx. 714, at *1 (2d Cir. 2013). Turning Point need show no more.

        2.    <u>The City's Arguments Are Unavailing</u>

The City erects several straw-man arguments that do not defeat Turning Point's standing. They claim Turning Point has suffered only speculative, future injury; that Turning Point's "choice" to counsel women about the Policy is not harmful in light of its other ongoing counseling services, Opp. at 11; and that Turning Point improperly alleges standing on the basis of harm to its members, not itself. None of these assertions has merit.

<u>First</u>, Turning Point has already suffered concrete injury from ongoing advocacy efforts. The City's emphasis on Turning Point's plans for future advocacy ignores the harms that have befallen Turning Point to date because of the NYPD's forced removal of religious head coverings for mug shots. *See supra* Part IV.A.1. The City has no answer to these injuries.

In addition, the harm to Turning Point from future remedial measures is "real and immediate." *Tartikov*, 915 F. Supp. at 593. The Complaint alleges that Turning Point currently "plans to implement further measures to remedy the Policy's harm to the community." Compl. ¶ 49. Turning Point diverts resources and expends costs on an ongoing basis to craft projects that have not yet come to fruition. *Id.* These injuries have already occurred. They are *not* "conjectural or hypothetical." *Tartikov,* 915 F. Supp. 2d at 593. The City cites no authority for its crabbed view that an advocacy measure does not amount to diversion of resources unless it has already come to an end. There is none. As the Second Circuit has emphasized, even "scant" harm to an organization suffices to establish injury-in-fact. *Nnebe*, 644 F.3d at 157. Turning Point's ongoing work to plan and implement future remedial measures amply clears this low bar.

<u>Second</u>, standing can arise from being forced to expend *more* resources on activities already undertaken. In *NYCLU*, 684 F.3d at 286, Plaintiff NYCLU challenged defendant's policy

of excluding certain observers from Transit Adjudication Bureau ("TAB") hearings. The Second Circuit affirmed the District Court and held that the NYCLU had standing to challenge the exclusion policy because it made it more difficult for the NYCLU to carry out work it *already engaged in*—representing clients issued citations and investigating NYPD activity in public transit areas. *Id.* at 292-93, 295. Likewise, the Policy raises Turning Point's counseling costs—and increases the amount of its finite resources it must devote to counseling rather than the other advocacy efforts listed above—by creating trauma in the Muslim-American community that Turning Point serves. But for the Policy, Turning Point would not need to comfort and counsel women who have been required to remove their hijabs for mug shots. It could spend that time, and those resources, elsewhere. This forced shift from the organization's ordinary activities is enough to show standing. The City's claims to the contrary rely exclusively on *Citizens for Responsibility & Ethics in Washington v. Trump*, 276 F. Supp. 3d 174, 191-92 (S.D.N.Y. 2018), a case whose discussion of standing involved "no analysis at all."[9]

In any event, Turning Point's listed services to the Muslim community include far more than counseling, and include not only crisis intervention at police precincts, but also—*inter alia*—in-person and telephone counseling about issues ranging from safety planning, legal referrals, and family dispute resolution; public advocacy at local and national events, including partnership with related coalitions; community organization and training at hospitals, schools, universities, and city agencies; and social work internships. *See* Mettham Decl., Ex. C. The City's focus on counseling is mere cherry-picking.

---

[9] *See District of Columbia, et al., v. Donald J. Trump*, No. 17 Civ. 01596, ECF Dkt. No. 92, at 30 (Transcript of January 25, 2018 Motion Proceedings). The District Judge in this proceeding said of the decision cited by the City: "There was no analysis at all. I read his opinion. I read the transcript. There's a very [sic] little analysis in his declarations, I must tell you. So I read the opinion thinking, I better look at this anew. I'm not really even bound by the logic of the opinion at this point." *See id.*; *see also District of Columbia v. Trump*, 291 F. Supp. 3d 725 (D. Md. 2018) (denying motion to dismiss in part, concluding that plaintiffs had standing to seek declaratory and injunctive relief with respect to particular organizations, and "disagree[ing] with the conclusion reached by Judge Daniels in *CREW et al. v. Trump*, 276 F. Supp. 3d 174.").

Third, Turning Point has standing because of harm the organization itself suffered, *not* separate harm endured by its constituents or "members." Turning Point, not its members, had to divert its resources to conduct meetings and strategy sessions with employees and legal counsel to challenge the Policy. Compl. ¶ 49. Turning Point, not its members, had to review relevant documents and analyze information it obtained from constituents. *Id.* And Turning Point, not its members, was obliged—solely because of the Policy—to communicate with and counsel clients traumatized by the coerced removal of their hijabs. *Id.* The City is wrong to characterize these consequences as befalling Turning Point's *members* rather than Turning Point itself.

### B.   Plaintiffs Clark and Aziz Have Injunctive Standing

The City does not dispute that Plaintiffs Clark and Aziz have alleged injuries-in-fact that are fairly traceable to the NYPD's conduct and redressable by a favorable ruling. *Deshawn E.*, 156 F.3d at 344. They question only whether these Plaintiffs have plausibly alleged a "likelihood that [they] will be injured in the future," *id.*, and do not address whether Plaintiffs allege ongoing injuries equally sufficient to confer standing. Plaintiffs have alleged both.

#### 1.   The NYPD's Photo Database Is a Continuing Harm

Plaintiffs may show standing to seek prospective injunctive relief by demonstrating that they suffer "continuing, present adverse effects" from a prior violation of their rights. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1988) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

Plaintiffs Aziz and Clark still suffer the ongoing effects of the Policy. The Policy—under which the NYPD forced Plaintiffs to remove their hijabs for a mug shot in violation of their sincerely-held beliefs, then retained those photographs and made them indefinitely available to NYPD employees and the public—causes "an actual and ongoing injury because it forestalls the exercise of [Plaintiffs'] alleged constitutional rights." *Kachalsky v. Cacace*, 817 F. Supp. 2d 235,

249 (S.D.N.Y. 2011) (plaintiffs had standing to challenge handgun permit denials due to ongoing

injury). This continued harm confers standing on Plaintiffs Aziz and Clark to challenge the

Policy and its future application.

The NYPD maintains at least one photograph of Ms. Clark without her hijab, *see* Compl.

¶ 44, which "haunts Ms. Clark," *id.* ¶ 57. She is "distressed by the prospect of the photograph

being viewed again and again by men who are not members of her immediate family." *Id.*

Similarly, Ms. Aziz still suffers "substantial and lasting emotional distress" because of the forced

removal of her hijab for a mug shot. *Id.* ¶ 63. Like Ms. Clark, Ms. Aziz "continues to experience

distress and humiliation when she thinks about" the photographs the NYPD maintains of her,

"which depict her uncovered in violation of her religious beliefs." *Id.* ¶ 65. That these

photographs remain available to NYPD personnel and—on information and belief—in databases

maintained by other state and federal law enforcement agencies, *see id.* ¶ 29, "prolongs and

intensifies the NYPD's initial assault on Ms. Aziz's religious rights," *id.* ¶ 65.

These ongoing injuries are sufficient to confer standing to seek prospective injunctive

relief on Plaintiffs Clark and Aziz. The harm inflicted by the Policy is not limited to the pain

each Plaintiff experienced in the moment of her forced uncovering. It recurs indefinitely—to this

day—because a photograph that violates Plaintiffs' sincerely-held beliefs is available, at any

time, to numerous people, including men not of their faith and outside their *mahram*.

Where the government has obtained information about citizens in unconstitutional ways,

its maintenance of that material confers injunctive standing on those citizens. The Eastern

District's decision in *Janfeshan v. U.S. Customs and Border Protection*, No. 16 Civ. 6915, 2017

WL 3972461, at *6-*7 (E.D.N.Y. Aug. 21, 2017), is instructive. There, Janfeshan was stopped at

an airport by agents who seized his smartphone, then copied and retained its digital contents

22

without his consent. The Court held that Janfeshan "need not speculate regarding any future injuries that the government might inflict" because he "has standing to allege injury from the collection, and maintenance in a government database, of records relating to him." *Id.* at *7 (internal alterations omitted). The Court explained: "This is not merely a past injury because Janfeshan alleges that he continues to experience adverse effects from [defendant's] actions, which include copying and retaining the [records]." *Id.* Just so here. The City took photographs of Plaintiffs Aziz and Clark uncovered, without their consent. They retained these photographs and made them widely available. Plaintiffs "continue[] to experience adverse effects" from these actions. *Id.*; *see also ACLU v. Clapper*, 785 F.3d 787, 801 (2d Cir. 2015) (standing to challenge "maintenance in a government database, of records relating to [plaintiffs]"); *Toney-Dick v. Doar*, 12 Civ. 9162, 2013 WL 5295221, at *12 (S.D.N.Y. 2013) (standing to challenge programs that "fail to provide reasonable accommodations for individuals with disabilities").

Plaintiffs' standing is particularly clear because they lack a statutory remedy for their continued harm. *Contrast Abidor v. Napolitano*, 990 F. Supp. 2d 260, 275 (E.D.N.Y. 2013) (no standing where "under the [same] regulations [plaintiff] is entitled to have the materials destroyed"). Unlike the plaintiff in *Abidor*, who was entitled to request harmful materials be destroyed, the City offers Plaintiffs no such mechanism. Plaintiffs are helpless to stop the retention and distribution of photographs and are harmed anew each time they are viewed.

The City relies on the "implicit premise" that Plaintiffs Aziz and Clark, "because they no longer [are in police custody], are no longer injured. That is false." *Laumann v. Nat'l Hockey League*, 105 F.Supp.3d 384, 409 (S.D.N.Y. 2015) (plaintiffs who did not purchase product still suffered ongoing harm in consumer market). "Defendant['s] attempt to shift the focus of this inquiry to future, contingent events in an attempt to describe the purported injuries as

'speculative' is unavailing," because "there is no contingency here upon which Individual

Plaintiffs' injuries are conditioned." *Kachalsky*, 817 F. Supp. 2d at 249. Plaintiffs are harmed

today—and every day—because of the photographs in the City's possession. An injunction

forbidding the NYPD from applying its Policy would redress these ongoing injuries.

        2.     <u>Plaintiffs Plausibly Will Be Subjected to the Policy in the Future</u>

Plaintiffs also have standing based on alleged future injury from the Policy.

Ms. Clark's arrest for violating an order of protection was not unique. Her ex-husband

"fabricated these charges to secure immigration status as a purported victim of domestic

violence," and "Ms. Clark had previously been arrested on the same charges" although they were

ultimately dismissed.[10] Compl. ¶ 52. Ms. Clark remains entangled in a divorce dispute with her

ex-husband; her family conflict is ongoing. *Id.* And while Ms. Clark resides in New Jersey, *see*

Opp. at 8, she is employed in Manhattan, and comes to New York City frequently to work,

socialize, and see members of her family. Having been repeatedly arrested in the past for charges

relating to her relationship with her ex-husband, *id.*, it is likely that Ms. Clark will be arrested

again in the future and again forced to remove her head covering for a mug shot. "The possibility

of recurring [future] injury ceases to be speculative when actual repeated incidents are

documented." *Davis v. City of New York*, 902 F. Supp. 2d 405, 444 n.225 (S.D.N.Y. 2012)

(citation and internal quotation omitted).

Plaintiff Aziz, while arrested only once to date, is also likely to encounter law

enforcement again in light of her contentious relationship with relatives who regularly seek

police assistance in family matters. *See* Compl. ¶ 58. Given the facts alleged in the Complaint, it

is likely that Ms. Clark and Ms. Aziz will both be arrested in the future on charges arising out of

---

[10] The City notes that Ms. Clark does not allege any violation of her rights stemming from her first arrest by the NYPD. *See* Opp. at 9 n.4. That is so—but only because Ms. Clark did not choose to wear hijab at the time of her first arrest. *See* Compl. ¶ 19 (Ms. Clark "has covered regularly for nearly ten years and daily for the past year").

their troubled, abusive family circumstances. *See Deshawn E.*, 156 F.3d at 342-44 (children had standing to seek prospective injunctive relief against NYPD policy of coercive interrogation because they had been interrogated repeatedly in the past and "plausibly alleged" they were likely to be interrogated again in the future).

Plaintiffs Clark and Aziz allege that they have been repeatedly—and baselessly—targeted by family members, leading to police involvement and arrest. Compl. ¶¶ 52, 58. They regularly experience litigious family conflict that implicates law enforcement. It is plausible that Ms. Clark and Ms. Aziz will again be arrested based on allegations made against them by family members, and will again be forced to remove their head coverings and be photographed uncovered by the NYPD. Both women have standing to seek an injunction prohibiting the application of the Policy or requiring that a new policy be put in place.

## CONCLUSION

The City's motion should be dismissed in its entirety.

Dated: July 27, 2018

COUNCIL ON AMERICAN-ISLAMIC          EMERY CELLI BRINCKERHOFF
RELATIONS OF NEW YORK                & ABADY LLP
Albert F. Cahn
46-01 Twentieth Avenue
Queens, New York, 11105                        _____/s/_____
(646) 665-7599                       O. Andrew F. Wilson
                                     Emma L. Freeman
                                     600 Fifth Avenue, 10th Floor
                                     New York, New York 10020
                                     (212) 763-5000

                                     *Attorneys for Plaintiff*

25