UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMILLA CLARK and ARWA AZIZ, on
Behalf of Themselves and Others Similarly
Situated, and TURNING POINT FOR WOMEN
AND FAMILIES,

                          Plaintiffs,

-against-

CITY OF NEW YORK,

                          Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/17/2021_

18 Civ. 2334 (AT) (KHP)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

    Does the United States Constitution permit the New York City Police Department (the "NYPD") to require an observant Muslim woman to remove her hijab when sitting for an arrest photo? The Court holds that it does not. In this action, two Muslim women and a not-for-profit organization challenge the NYPD's former policy of requiring arrested individuals to remove religious head coverings (the "Policy").[1] Compl., ECF No. 1. Although Plaintiffs initially sought injunctive and declaratory relief, these claims have been settled. ECF No. 153. Plaintiffs' claims for monetary damages remain extant. On September 30, 2020, the Court issued an order dismissing Plaintiffs' demand for punitive damages and Arwa Aziz's state law claims. ECF No. 144. The Court also denied the balance of the City's motion, and now sets forth its reasoning in this Opinion and Order. *Id.*

    Plaintiffs, Jamilla Clark, Arwa Aziz, and Turning Point for Women and Families ("Turning Point"), bring this action against Defendant, the City of New York (the "City"),

---

[1] During the pendency of this lawsuit, the NYPD changed its policy such that arrestees are now permitted to wear a religious head covering when sitting for a mug shot. *See Arrests – Religious Head Covering Guidelines*, Procedure No. 208-83, NYPD Patrol Guide, at 186 (Aug. 23, 2021), https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/public-pguide2.pdf.

alleging claims under 42 U.S.C. § 1983 and New York law arising from the NYPD policy requiring all arrested individuals to have their photographs taken without a head covering. *See* Compl. Specifically, Plaintiffs allege violations of their rights under (1) the Religious Land Use and Institutionalized Persons Act (the "RLUIPA"), 42 U.S.C. § 2000cc *et seq.*; (2) the Free Exercise Clause of the First Amendment to the U.S. Constitution, U.S. Const. amend. I; and (3) the Free Exercise Clause of the New York State Constitution, N.Y. Const. art. 1, § 3. Compl. ¶¶ 81–102. The City moves to dismiss the complaint for lack of standing and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 20. For the reasons stated below, the City's motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are taken from the complaint, which the Court accepts as true for purposes of this motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). Pursuant to the Policy, arrestees were required to remove their religious head coverings for an official photograph (the "Booking Photograph"). Compl. ¶¶ 4, 21; New York, N.Y., Interim Order 29 Rev. to Patrol Guide 208-03 and 208-07 (Mar. 2, 2015) ("Interim Order 29"), *available at* ECF No. 131-1. Prior to March 2, 2015, "the NYPD had no formal policy governing how to photograph arrestees who refuse to remove their religious head coverings." Compl. ¶ 22. The NYPD implemented Interim Order 29 on that date, to "accommodate arrestees who refuse to remove their religious head covering for an official . . . photograph." Interim Order 29 ¶ 1.

First, Interim Order 29 requires that where an arrestee indicates a preference to retain her head covering for a mug shot, the arrestee will be transported to One Police Plaza, where the "arrestee can remove their religious head covering and have their photograph taken in

private." Interim Order 29 ¶¶ 1, 2(a). At One Police Plaza, a "member of the service of the same gender [as the arrestee]" must be available to take the photograph. *Id.* ¶ 2(a). Additionally, arrestees who are transported there "will be informed that their arrest processing may be delayed due to operational requirements." *Id.* ¶ 3(a). The resulting Booking Photographs, which depict arrestees without religious head coverings, are "integrated into other law enforcement databases, including the NYPD's so-called 'Forensic Imaging System,' that use sophisticated facial recognition software." Compl. ¶ 29 (footnote omitted). Plaintiffs allege that this practice "increases the likelihood that images of arrestees without their religious head coverings will be viewed by many people long after the Booking Photograph is taken." *Id.*

I. Clark's and Aziz's Arrests

On January 9, 2017, Jamilla Clark was arrested for violation of an order of protection and taken into custody at Manhattan Family Court. *Id.* ¶ 52. Clark informed the arresting officers that, as a practicing Muslim, she could not come into physical contact with men and was required to wear her hijab—a garment worn by many Muslim women that covers the ears, hair, and neck, but leaves the entire face exposed[2]—at all times. *Id.* ¶¶ 16, 53. Clark uses a hijab because she believes her faith dictates that no man outside of a woman's immediate family should see her uncovered hair, head, and neck. *Id.* ¶ 19. She wears her hijab every day when in the presence of men outside of her immediate family. *Id.* ¶¶ 17, 19.

Despite Clark's explanation of her religious beliefs, officers at NYPD Central Booking ordered her to take off her hijab for a Booking Photograph. *Id.* ¶ 54. Clark reiterated that "she could not remove her hijab in front of men who do not belong to her immediate family because of her Muslim faith." *Id.* A supervisor informed Clark that she would be criminally prosecuted

---

[2] Unlike a hijab, a niqab is a veil that covers the face. Compl. ¶ 16. Neither Clark nor Aziz wears a niqab. *Id.*

if she did not take off the hijab and made hostile comments about Muslims. *Id.* Clark demurred. *Id.* Later, Clark was transported to One Police Plaza, where—fearful of criminal charges—she removed her hijab to be photographed in a private room. *Id.* ¶ 55. Clark observed a surveillance camera there, and the female officer who photographed her later showed the picture to approximately five male officers. *Id.* Male officers also touched Clark repeatedly despite her protestations. *Id.*

The removal of Clark's hijab left her "agitated and distraught." *Id.* ¶ 56. Clark alleges that "the NYPD still maintains at least one photograph of [her] without her hijab" and that "[t]he existence of this photograph haunts . . . Clark, who is distressed by the prospect of the photograph being viewed again and again by men who are not members of her immediate family." *Id.* ¶ 57.

On August 30, 2017, Arwa Aziz voluntarily submitted herself to NYPD custody at the Sixty-Eighth Precinct in Brooklyn, after her sister-in-law obtained an order of protection and requested that NYPD officers arrest Aziz for violating the order. *Id.* ¶ 58. Aziz wears her hijab daily and believes her faith requires as much. *Id.* ¶ 19. After Aziz arrived at the precinct, NYPD officers took her photograph with her hijab on, then handcuffed her and drove her to Brooklyn Central Booking to be photographed again. *Id.* ¶ 59. Once there, in a hallway with over thirty male prisoners and a dozen male officers present, officers demanded that Aziz take off her hijab to be photographed. *Id.* ¶ 59. Aziz stated that, for religious reasons, she could not remove it. *Id.* ¶ 60. The officers informed Aziz that she could have her picture taken privately at One Police Plaza, but warned her a female photographer might not be available, and threatened to "restart" the booking process if she chose to relocate. *Id.*

Having already waited for close to one hour, Aziz asked the officers if she could push her hijab back to reveal her bangs and hairline for the photo. *Id.* ¶ 61. The officers repeated their

refusal. *Id.* Again, they ordered Aziz to take off her hijab entirely. *Id.* In tears, Aziz complied. *Id.* ¶ 62. For five minutes, officers photographed Aziz from the front and in profile, taking three photographs. *Id.* Although some male prisoners in the hallway turned away to afford Aziz some privacy, the officers did not. *Id.*

Aziz alleges that "the NYPD still maintains at least three photographs of her without her hijab" and that she "continues to experience distress and humiliation when she thinks about these photographs, which depict her uncovered in violation of her religious beliefs." *Id.* ¶ 65.

## II. Turning Point

Turning Point is a Queens-based not-for-profit organization that "advocates for and assists Muslim women and girls who have been the victims of domestic violence." *Id.* ¶¶ 3, 12. Turning Point accomplishes this objective through direct services and advocacy on behalf of such women and girls. *Id.* ¶ 12. To combat the effects of the Policy, Turning Point diverted its limited resources away from direct services and advocacy towards addressing the Policy's impact on its members. *Id.* ¶ 49.

## III. National Policies

Government and law enforcement entities across the country permit those in custody to wear religious head coverings in official photographs. *Id.* ¶ 33. For example, numerous law enforcement agencies—including those in Dearborn Heights, Michigan; Long Beach, Orange County, and San Bernardino County, California; Hennepin County, Minnesota; and Cumberland County, Maine[3]—have changed their procedures to permit the use of religious head coverings

---

[3] Although not discussed in the complaint, it appears that Louisville, Kentucky and Ramsey County, Minnesota have also changed their religious head covering policies. *Ruplinger v. Louisville/Jefferson Cty. Metro Gov't.*, No. 19 Civ. 583 (W.D. Ky. 2019), ECF No. 1-3 ¶ 62; Ted Hennessey, *Woman Allegedly Forced To Remove Hijab for Mugshot Gets $120,000 Settlement*, Evening Standard, Dec. 18, 2019, https://www.standard.co.uk/news/world/muslim-woman-in-minnesota-gets-120-000-settlement-after-allegedly-being-forced-to-remove-her-hijab-for-mugshot-a4316801.html. The Court does not take judicial notice of the truth of these policies, but includes these facts for comprehensiveness.

for mug shots. *See id.* ¶¶ 37–42. Federally, the United States Department of State "permits those who wear hats or head coverings for religious reasons to keep those coverings on in official passport photographs." *Id.* ¶ 34. The same is true of the United States Citizenship and Immigration Services ("USCIS"), which "issued a policy memorandum on July 23, 2012 that permits religious head coverings to be worn in photographs." *Id.* ¶ 35. To accommodate those who are photographed, USCIS will "ask an individual to remove or adjust portions of religious headwear that covers all or part of the individual's face," and will offer the wearer a private area to adjust the covering and a photographer of their gender. *Id.* The New York State Department of Motor Vehicles likewise permits an applicant for a driver's license to keep her hijab on for the license photograph. *Id.* ¶ 36.

## DISCUSSION

I. <u>Legal Standards</u>

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). To survive a Rule 12(b)(1) motion to dismiss, the party asserting jurisdiction "has the burden of proving by a preponderance of the evidence that [subject matter jurisdiction] exists." *Id.* On such a motion, "the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). However, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Id.* (quotation marks, alterations, and citation omitted).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its

6

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

    II.   <u>Analysis</u>

        A. Turning Point's Standing

As an initial matter, the Court rejects the City's argument that the alleged "injuries are insufficient to confer standing on Turning Point." Def. Mem. at 10, ECF No. 22. "[A]n organization may assert two distinct types of standing: (1) organizational standing, and (2) associational standing." *Rodriguez v. Winski*, 444 F. Supp. 3d 488, 492 (S.D.N.Y. 2020). Here, Turning Point alleges organizational standing. Compl. ¶¶ 49–50; Pl. Opp. at 17–21, ECF No. 31.

Under the organizational standing theory, "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To establish that standing, an organization must show that it "suffered an injury in fact that is distinct and palpable;" and that the injury is "fairly traceable to the challenged action" and "must be likely redressable by a favorable decision." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)

(quotation marks and citations omitted).  "[O]nly a perceptible impairment of an organization's activities is necessary for there to be an injury in fact."  *Id.* at 157 (quotation marks and citations omitted).

Turning Point alleges that the Policy compelled the organization to "divert[] its limited resources to respond to allegations by its members that they had been forced to remove their hijabs for the Booking Photograph."  Compl. ¶ 49.  Before the Policy was implemented, Turning Point offered direct services and advocacy for victims of domestic violence.  *Id.* ¶¶ 49–50.  After the Policy was adopted, Turning Point was compelled to divert resources from these services by offering counseling services to clients subject to the Policy, expend staff time reviewing clients' claims with respect to the Policy, and launch community programming initiatives to remedy the Policy's impact on the community.  *Id.* ¶ 49.  Turning Point claims, therefore, that the Policy has "frustrated" its ability to carry out its "stated mission to protect the legal rights of Muslim women and girls."  *Id.* ¶ 50.

Based on these allegations, Turning Point has standing.  The caselaw is clear that an organization is injured when it must redirect resources from its usual services to counteract an allegedly discriminatory policy.  *See, e.g.*, *Nnebe*, 644 F.3d at 157 (holding that an organization that diverted resources from its usual programing to "provid[e] initial counseling" to its members in response to an allegedly unconstitutional policy suffered an injury in fact sufficient to convey standing); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that "there can be no question that the organization has suffered injury in fact" when its resources were diverted from its mission to counteract an allegedly discriminatory policy).  Even construing Turning Point's activities regarding the Policy as actions in furtherance of its mission, Turning Point still has standing because the Policy made carrying out its mission more costly.  *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104,

110 (2d Cir. 2017) ("The record demonstrates that [the organization's] activities include traveling to day laborer sites in Oyster Bay to speak with laborers and if the [o]rdinance achieves one of its principal objectives—disbursement of day laborers—[the organization] will inevitably face increased difficulty in meeting with and organizing those laborers."); *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (holding that an organization that had an interest in attending certain hearings had standing to challenge a policy that impeded access to those hearings).

Accordingly, the City's motion to dismiss Turning Point's damages claims for lack of standing is DENIED.

### B. Damages Under RLUIPA

The City next argues that Clark and Aziz cannot maintain a claim for money damages because this remedy is unavailable as against a municipality under the RLUIPA. Def. Mem. at 4.

The law in this and other circuits is unsettled regarding whether money damages are available from municipalities under the RLUIPA. *Pugh v. Goord*, 571 F. Supp. 2d 477, 506 (S.D.N.Y. 2008). Plaintiffs rely on *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 290 (5th Cir. 2012), as well as cases out of the Ninth and Third Circuits, in support of their position. Pl. Opp. at 6 (citing *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1168–69 (9th Cir. 2011) ("The City of Yuma, therefore, may be liable for monetary damages under RLUIPA . . . "); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 261–73 (3d Cir. 2007) (permitting a claim for compensatory damages under RLUIPA to proceed against a municipality)). In *Opulent Life*, the Fifth Circuit held that money damages against a municipality are not disallowed under the RLUIPA. In so holding, the court explained that the RLUIPA contains no indication that Congress intended to exclude a money damages remedy against municipalities, and "[u]nder Supreme Court precedent, money damages

9

are available against municipal entities unless Congress has given clear direction that it intends to *exclude* a damages remedy from a cognizable cause of action." 697 F.3d at 290 (emphasis in original) (quotation marks and citation omitted). In reaching this conclusion, the Fifth Circuit distinguished precedent holding that damages are unavailable against states under the RLUIPA. *Id.* at 289–90. Because states enjoy sovereign immunity under the Eleventh Amendment to the Constitution, the RLUIPA's failure to clearly abrogate that immunity prevents parties from holding states liable for damages under the RLUIPA. *Id.* That same logic does not apply to municipalities, however, because they do not benefit from Eleventh Amendment immunity. *Id.*

Cases relied on by the City are inapposite. Def. Mem. at 4. They offer no meaningful analysis regarding the distinction between states and municipalities, instead focusing on damages against individuals. *See, e.g.*, *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) ("RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities."); *Keaton v. Ponte*, No. 16 Civ. 3063, 2017 WL 3382314, at *9 (S.D.N.Y. Aug. 4, 2017) ("RLUIPA claims for money damages fail because RLUIPA does not afford a plaintiff a cause of action for money damages against individual defendants in either their official or individual capacities."); *Shepherd v. Fisher*, No. 08 Civ. 9297, 2017 WL 666213, at *31 (S.D.N.Y. Feb. 16, 2017) ("RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities."); *Ramrattan v. Fischer*, No. 13 Civ. 6890, 2015 WL 3604242, at *9 (S.D.N.Y. June 9, 2015) ("RLUIPA does not afford a plaintiff a cause of action for money damages against individual defendants in either their official capacities, or their individual capacities." (citations omitted)); *Loccenitt v. City of New York*, No. 12 Civ. 948, 2013 WL 1091313, at *6 (S.D.N.Y. Mar. 15, 2013) ("To the extent that [p]laintiff seeks monetary damages against any of the individual defendants under the RLUIPA, such claims are dismissed as money damages are not available under the RLUIPA against

individual defendants in their individual or official capacities."). The City cites one opinion stating that "[m]oney damages are not available under RLUIPA" for a plaintiff who sought relief from the City, implying that money damages are not available against municipalities under the RLUIPA. *Powell v. City of New York*, No. 14 Civ. 9937, 2016 WL 4159897, at *7 (S.D.N.Y. July 14, 2016), *report and recommendation adopted*, No. 14 Civ. 9937, 2016 WL 4147203 (S.D.N.Y. Aug. 3, 2016). However, the Court is not persuaded to adopt this reading of the statute, as *Powell*'s support for this statement relies on *Holland* and *Ramrattan*, which discuss damages against individuals. *Id.* Given the unsettled question of law in this Circuit and the rationale set forth by the Fifth Circuit (and the Ninth and Third Circuits' approaches), the Court adopts the reasoning in *Opulent Life* and finds that the RLUIPA does not foreclose money damages against a municipality.

Accordingly, the City's motion to dismiss Clark's and Aziz's damages claims under the RLUIPA for lack of standing is DENIED.

      C.  First Amendment Claim

The First Amendment to the Constitution forbids the government from "prohibiting the free exercise" of religion. U.S. Const. amend I; *see also Phillips v. Sage Colls.*, 83 F. App'x 340, 341 (2d Cir. 2003) ("[T]he United States Constitution regulates only government action . . . ."). To allege that government action is unconstitutional, an individual can bring a claim under § 1983, alleging that she was injured by a state actor. *Id.* To bring a claim under § 1983 against a municipality specifically, also known as a *Monell* claim, the plaintiff must show "that action pursuant to official municipal policy caused the alleged constitutional injury." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quotation marks omitted) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Although the parties do not address this issue, there is no dispute that Interim Order 29

11

constitutes such a policy. *See* Def. Mem.; *see also* Pl. Opp. When applied as written, the Policy does not allow the arrestee's head covering to be removed in a manner consistent with her religious beliefs because the photograph of her uncovered will be shown to men. Compl. ¶¶ 55, 57, 65; *see J.H. v. Bratton*, 248 F. Supp. 3d 401, 409–10 (E.D.N.Y. 2017) (holding there was no *Monell* claim where plaintiff argued that "*any* policy requiring arrestees to remove their head coverings for arrest photos is unconstitutional . . . because the [c]ourt would need to know more about the policy to evaluate its constitutionality, namely, whether the policy, either on paper or in practice, allows or prohibits religious accommodations with respect to the removal requirement").

The City argues that Plaintiffs' claim under § 1983—that the Policy deprives the class members of their right to exercise their religion freely under the First Amendment to the Constitution—should be dismissed because the Policy is "reasonably related to the City's recognized interest in identifying prisoners and maintaining safety and security." Def. Mem. at 12. The Court disagrees.

The Second Circuit has held that "[i]t is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the 'incidental effect' of an otherwise neutral provision." *Seabrook v. City of New York*, 210 F.3d 355, at *1 (2d Cir. 2000) (quoting *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878 (1990)). "Where the government seeks to enforce a law that is neutral and of general applicability . . . then it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002).

Plaintiffs concede that the Policy is a neutral provision applied to all arrestees. Pl. Opp. at 2. Plaintiffs argue, however, that the Policy cannot survive even rational basis scrutiny, because it substantially burdens the sincerely-held religious beliefs of arrestees who use religious head coverings, specifically Muslim women who wear hijabs, and bears no reasonable relationship to the City's alleged security interest. Pl. Opp. at 8; Compl. ¶ 15; *see Salahuddin v. Goord*, 467 F.3d 263, 275–76 (2d Cir. 2006) ("[I]t was clearly established at the time of the alleged violations that prison officials may not substantially burden inmates' right to religious exercise without some justification . . . ."); *see also* Mehwish Shaukat, *American Muslim Women: Who We Are and What We Demand from Feminist Jurisprudence*, 31 Hastings Women's L.J. 155, 163 (2020) ("In many police precincts, [American Muslim women] are forced to remove their hijabs for mugshots.").

When prisoners challenge restrictions on their religious liberty, courts apply the rational basis test by evaluating (1) "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective," (2) "whether prisoners have alternative means of exercising the burdened right," (3) "the impact on guards, inmates, and prison resources of accommodating the right," and (4) "the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Holland*, 758 F.3d at 222–23 (quoting *Salahuddin*, 467 F.3d at 274); *see also Turner v. Safley*, 482 U.S. 78, 84 (1987). In analyzing claims that the NYPD's failure to provide a religious accommodation with respect to arrest booking lacks a rational basis, courts in this Circuit have found "guidance in the body of caselaw addressing free-exercise claims brought by prisoners seeking accommodation of their religious practices in the penological context." *Soliman v. City of New York*, No. 15 Civ. 5310, 2017 WL 1229730, at *7 (E.D.N.Y. Mar. 31, 2017). Plaintiffs argue that when applying the rational basis test to arrestees—as opposed to

13

prisoners—a court should more closely scrutinize the City's justification for its policy. Pl. Opp. at 9–10; *Salahuddin*, 467 F.3d at 274 ("[A]lthough prisoners do not abandon their constitutional rights at the prison door, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights . . . . Accordingly, . . . a challenged prison regulation is judged under a reasonableness test less restrictive than that ordinarily applied[.]" (quotation marks, alterations, and citations omitted)).

But, even if the Court were to evaluate Plaintiffs' cause of action using the standard applied to prisoner claims, where courts tend to accept the City's stated justification for a policy, the Court would conclude that the Policy violates the First Amendment. Both parties agree that the City has a legitimate governmental interest in maintaining a photographic record of arrestees. Pl. Opp. at 10; Def. Mem. at 13. But, Clark and Aziz have no alternative means of exercising their right to wear a hijab in public, at all times. The Policy, although sometimes inconsistently applied, still requires that Clark and Aziz remove their hijabs and makes their photographs available to men. Compl. ¶¶ 25–29, 32. The Court agrees with Plaintiffs that permitting observant Muslim women to wear a hijab while being photographed as part of booking procedure would have reasonably accommodated their beliefs and also would be less burdensome on the NYPD. Pl. Opp. at 10. Indeed, snapping a Booking Photograph of an arrestee with her religiously compelled covering would expend fewer resources than "requir[ing] dialogue with arrestees and additional time spent negotiating removal." *Id.*

Finally, the City contends that it has a legitimate interest in "having a photographic record of arrestees from which a later identification can be made." Def. Mem. at 14. But Plaintiffs point out that the Policy requires the arrestee to alter "her ordinary appearance *before* she is photographed (*i.e.*, remove the hijab she customarily wears, will replace immediately after she is photographed, and plans to wear while in custody)," making a later identification more

14

difficult.  Pl. Opp. at 11.  Allowing an arrestee to maintain her ordinary appearance in a Booking Photograph does not undermine the legitimate interest of keeping a photographic record of arrestees.  The United States Department of State, the USCIS, and the New York State Department of Motor Vehicles all allow religious head coverings in photographs used for identification.  Compl. ¶¶ 34–36.  Police departments in Michigan, California, Minnesota, and Maine also allow arrestees to wear religious head gear while sitting for a mug shot.[4]  *Id.* ¶¶ 38–42; *Ruplinger*, ECF No. 1-3 ¶ 62.  Plaintiffs correctly observe that arrestees who do not wear a head covering are equally capable, if not more capable, of making changes to their appearances after a Booking Photograph by switching hairstyles or facial jewelry.  Pl. Opp. at 11.  In fact, photographing the arrestee in her ordinary appearance likely *furthers* law enforcement's interest in identification—rather than impeding such interest—because arrestees who have a sincere religious belief that requires them to wear a head covering are likely to be wearing that same covering when the need to identify them arises.  *See Turner*, 482 U.S. at 91 ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.").  In sum, Plaintiffs have alleged facts that establish that requiring the removal of a hijab does not rationally advance the City's valid interest in readily identifying arrestees.

Accordingly, the City's motion to dismiss Plaintiffs' claim of religious discrimination under the Constitution is DENIED.

---

[4] One police department prevents Booking Photographs of Muslim women without their head coverings from being publicly-available.  *Schlussel v. City of Dearborn Heights*, 753 F. App'x 359, 360 (6th Cir. 2018).

D. State Law Religious Discrimination Claim

In addition to her claims under the Free Exercise Clause, Clark also asserts a claim of religious discrimination under the New York Constitution. Article I of the New York Constitution, titled Bill of Rights, protects the "free exercise and enjoyment of religious profession and worship, without discrimination or preference." N.Y. Const. art. I, § 3. The City argues that Clark's claim under the New York Constitution must be dismissed because (1) the state constitution does not provide a private cause of action, and (2) in any event, Clark has not adequately alleged such a claim. Def. Mem. at 16–18. The Court disagrees.

First, as the parties seem to agree, the question of whether Clark has a private right of action under § 3 of the New York Bill of Rights is a novel question of New York law. *See* Pl. Opp. at 14; Def. Reply at 9, ECF No. 34; *see also Soliman*, 2017 WL 1229730, at *8. In *Martinez v. City of Schenectady*, the New York Court of Appeals provided general guidance on the circumstances in which a court may recognize an implied right of action to enforce provisions of the New York Constitution. 761 N.E.2d 560, 563–64 (N.Y. 2001). The *Martinez* court stated that the inquiry is informed by two interests: "the private interest that citizens harmed by constitutional violations have an avenue of redress, and the public interest that future violations be deterred." *Id.* at 563. Courts should recognize an implied right of action under the New York Constitution only where the implied right is "necessary to effectuate the purpose of the [s]tate constitutional protections [the] plaintiff invokes," and "appropriate to ensure full realization of [the plaintiff's] rights." *Id.* at 563–64.

Although some courts in this Circuit have held that, where alternative remedies are available for an alleged violation of rights under the New York Constitution, courts should not recognize an implied right of action under the New York Constitution, *see Biswas v. City of New York*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (collecting cases), the Court is persuaded to join

16

those which have declined to dismiss claims under the New York Constitution. There appears to be no "basis in New York law to deny a right of action under the New York Constitution based on remedies that may be obtainable under *federal* law." *Soliman*, 2017 WL 1229730, at *9 (emphasis in original); *see also J.H.*, 248 F. Supp. 3d at 414; *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 595 (S.D.N.Y. 2013) (concluding plaintiffs adequately alleged a violation of Article 1, § 3 and implicitly assuming a private right of action exists); *see also Ackridge v. Aramark Corr. Food Servs.*, No. 16 Civ. 6301, 2018 WL 1626175, at *22 (S.D.N.Y. Mar. 30, 2018) (denying motion to dismiss Article I, § 3 claim and implicitly assuming a private right of action exists). Given that the New York Constitution creates rights and protections that are independent from the rights and protections afforded under federal law, *see, e.g.*, *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1278 (N.Y. 1991), the Court is reluctant to conclude that Clark's claim under federal law is adequate to fully vindicate her rights under the New York Constitution.

With respect to the merits of Clark's religious discrimination claim, the City contends that "Plaintiffs have not plausibly alleged that [the] Policy is an unreasonable interference with religious freedom . . . [g]iven that substantial deference is due the City in protecting its unassailable interests in maintaining safety and security." Def. Mem. at 18. For the reasons outlined above, Clark has stated a plausible free exercise claim under § 3 of the New York Constitution. The Policy amounts to an "unreasonable interference" with her religious freedom: it does not serve any legitimate City interest and directly impedes Clark's sincerely-held belief that she must wear her hijab at all times in public. *Catholic Charities of the Diocese of Albany v. Serio*, 859 N.E.2d 459, 525 (N.Y. 2006); *see also Ackridge*, 2018 WL 1626175, at *22 (finding violation of Article I, § 3 "[f]or the same reasons the Court found the allegations sufficient to state a violation of [the p]laintiff's Free Exercise rights for the delay in receipt of kosher meals

17

and lack of regular Jewish religious services"); *supra* § II.B.  This is especially so because New York's free exercise clause is "more protective of religious exercise" than its federal counterpart. *Catholic Charities*, 859 N.E.2d at 525.

Accordingly, the City's motion to dismiss Clark's claim of religious discrimination under the New York Constitution is DENIED.[5]

### E. Punitive and Compensatory Damages

For the reasons stated in the Court's order dated September 30, 2020, ECF No. 144, Plaintiffs' demand for punitive damages is DISMISSED and Aziz's state law claim for compensatory damages is DISMISSED without prejudice.

## CONCLUSION

For the reasons stated above, the City's motion to dismiss is GRANTED only with respect to Plaintiffs' demand for punitive damages and Aziz's state law claim for compensatory damages.  The City's motion is otherwise DENIED.

SO ORDERED.

Dated: September 17, 2021
       New York, New York

_____
ANALISA TORRES
United States District Judge

---

[5] Although the City urges the Court to decline supplemental jurisdiction over this claim because "Plaintiffs concede that no court has addressed this issue of state law," Def. Reply at 9, the Court exercises its supplemental jurisdiction in the interest of judicial economy.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (noting that supplemental jurisdiction "is a doctrine of flexibility, designed to allow courts to deal with cases involving pendant claims in the manner that most sensibly accommodates a range of concerns and values"); *see also Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he discretion implicit in the [supplemental jurisdiction statute] permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants.").