UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  12/08/2022
```

-------------------------------------------------------------------X

JAMILLA CLARK, et al.,

                           Plaintiffs,

          -against-

CITY OF NEW YORK,

                         Defendant.

**ORDER**

**18-CV-2334 (AT) (KHP)**

-------------------------------------------------------------------X

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE.**

This case concerns a former policy of the New York Police Department ("NYPD") that required arrestees to remove head coverings when photographed for an official police photograph. Under the former policy, religious head coverings, like all other head coverings, had to be removed for these official photographs. A religious head covering would be returned to the arrestee (who could then return to wearing the head covering) once the photograph was taken (unless there was an articulable reason to believe the head covering posed a safety risk in that particular case). In contrast, non-religious head coverings were and are not permitted to be worn while in custody of the NYPD.

Plaintiffs are two Muslim women who wear hijabs. They were arrested and required to remove their hijabs for the official police photograph. Under the NYPD policy at the time, both were permitted to have their photograph taken in a private location with only females present.

Plaintiffs contend that the NYPD policy that existed was not narrowly tailored to serve a compelling interest as required by law and violated their rights to free exercise of religion under the state and federal Constitutions and the Religious Land Use and Institutionalized Persons Act

1

("RLUIPA"), 42 U.S.C. § 2000cc, and "substantially burdened" their religious practice and beliefs. (ECF No. 157.)

Plaintiffs represent a class of "all persons who were required to remove their religious head covering for a post-arrest photograph while in the custody of the NYPD." (*Id*.)  The class consists of approximately 5,000 individuals and includes males and females of multiple religious faiths who wear religious head coverings.  This includes individuals wearing turbans and yarmulkes.[1]  About 200 individuals within the class are women who wear hijabs or niqabs; approximately forty-five percent of the class are individuals wearing turbans; and approximately twenty-five percent of the class are individuals wearing yarmulkes.  (ECF No. 255 at 4.)  Thirty-seven percent of the class is female.  (*Id.*)

Defendant deposed the lead plaintiffs who testified that they had no knowledge of Judaism, Rastafarianism or Sikhism and did not know whether or under what circumstances adherents to those religions could remove their religious head covering.  (ECF No. 214 at 2.)  The lead plaintiffs also had no knowledge of the specific harm to other class members caused by the removal of their head covering.

The parties also conducted expert discovery, and their experts disagreed regarding whether the harm caused by the removal of a religious head covering for a police photograph is necessarily equivalent across religions and for all types of religious head coverings.  Plaintiff's expert, Dr. Elizabeth Bucar, opined that "[w]earing a religious head covering is the

---

[1] Examples of religious head coverings are hijabs and niqabs worn by Muslim women; keffiyehs worn by Muslim men; tichels worn by Jewish women and kippahs or yarmulkes worn by Jewish men; dastars (a type of turban) worn by Sikhs; rastacaps worn by Rastafarian men; and habits, veils, bonnets or black felt hats worn by women or men of Christian faiths.

manifestation of the relationship between religious belief and practice," and the "coerced

removal" of *any* religious head covering necessarily "interferes with an individual's practice"

and constitutes a "profound offense." (ECF No. 257-2 at 1.) By contrast, Defendant's expert,

Dr. Ahmed El Shamsy, opined that "the category of religious head coverings encompasses

practices that differ so widely from one another as to make them—and the respective

consequences of their forced removal—incomparable." (ECF No. 257-3 at 1.) He opined that

the significance of religious head coverings varies with gender and religion, stating, for

example, that one person may wear a head covering for modesty in order to cover areas of her

body that her religion deems "private" or "naked," whereas others may simply wear a head

covering as a customary symbol of obedience. (*Id.* at 3-5.) Defendant's expert opines that the

mandatory but temporary removal of a head covering might substantially burden an individual

in the former category but not the latter.

**FACT DISCOVERY SOUGHT**

Defendant now requests permission to depose a statistically relevant sample of fifty[2]

absent class members to question them about the reasons for their wearing a religious head

covering, whether the tenets of their religion permit removal of the head covering and under

what circumstances, and the impact or burden on their religion caused by the removal of the

religious head covering under the former NYPD policy. Additionally, because the current

information on the class is not specific as to the reason for every class member wearing a head

covering, there is no way to discern whether all of the individuals in the identified group of

5,000 actually were wearing a head covering for religious purposes. Thus, Defendant also seeks

---

[2] Defendant arrived at the number 50 in consultation of their retained statistical expert.

to learn whether any of the individuals deposed were wearing a head covering for non-religious cultural reasons.[3]  The proffered purpose is not to question the bona fides or sincerity of an individual's faith, but rather to learn the impact and burden of the NYPD's former policy on the person based on the specifics of the person's religion, such as the specific explanation for wearing the head covering and the conditions, if any, under which it is permissible to remove the head covering.  The lead Plaintiffs were not able to answer these questions because they admittedly have no knowledge about the particulars of other class members' religions. Defendant contends that the depositions will illuminate whether there is a need for sub-classes for damages or liability and potentially support a decertification motion.  The proposed depositions will be less than two hours each and may be taken by video if needed to accommodate the deponent.

Plaintiffs oppose any fact discovery beyond the depositions of the two lead Plaintiffs. They contend that their expert, an academic, has supplied all the information that is needed to demonstrate that removal of any religious head covering for purposes of taking a police photograph is unlawful and a substantial burden on religious choice regardless of the religion and the specific tenets pertaining to the wearing and removal of a religious head covering. They argue Defendant has failed to show the depositions are necessary for purposes of trial of issues common to the class, and that the Court's decision certifying a class precludes fact discovery about the variability of beliefs and experience among class members of different religions.

---

[3] Defendant contends that a kufi, for example, which is sometimes worn by Muslims and Christians from certain parts of Africa and South Asia, can be worn for non-religious cultural reasons.  Defendant also contends that others may have been wearing du-rags and head wraps for non-religious purposes.

While the discovery sought is clearly relevant to the claims and defenses, Plaintiffs argue that the discovery is not proportional, contending that it is unlikely to inform the question of whether the policy "substantially" harmed religious practices/beliefs more than what has already been learned through the named Plaintiffs and the experts.  They also contend that absent class member discovery is rarely granted and only upon a strong showing by the defendant that it is necessary and helpful to the adjudication of the suit.  *In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 344715 at *2 (S.D.N.Y. Feb. 4, 2008).  The burden is particularly heavy when the discovery sought is deposition testimony.  *Redmond v. Moody's Inv. Serv.*, 1995 WL 276150 at *1 (S.D.N.Y. May 10, 1995).

## LEGAL STANDARD

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(3).  A proportionality assessment includes consideration of "the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(3).

Because a Rule 23 class generally permits absent class members to remain passive, permitting discovery from them must be carefully weighed to ensure that it is necessary and goes to class-wide issues.  *Indergit v. Rite Aid Corp.*, 2015 WL 7736533 *1 (S.D.N.Y. Nov. 30, 2015), objections overruled, 2016 WL 236248 (S.D.N.Y. Jan. 20, 2016).  Courts within this Circuit have thus identified four factors relevant to the consideration including whether the discovery: 1) is needed for trial or issues common to the class; 2) is narrowly tailored; 3) will impose an

undue burden on absent class members; and 4) is not available from representative plaintiffs. *In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 344715 at *2.

The Manual for Complex Litigation (Fourth) identifies other factors including whether the discovery sought would require class members to retain personal legal counsel or technical advice from an expert.  Manual for Complex Litigation, Fourth § 21.41 (2004).  It recognizes that in some circumstances courts have required absent class members (or a portion thereof) to respond to a questionnaire or answer interrogatories.  *Id.*

In sum, while rare, courts have permitted limited depositions of absent class members when the information sought goes to the heart of the claims in the case.  *See, e.g., Krueger v. New York Tel. Co.*, 163 F.R.D. 446, 451 (S.D.N.Y. 1995); *Indergit*, 2015 WL 7736533, at *3; *Schwartz v. Celestial Seasonings, Inc.*, 185 F.R.D. 313, 319-20 (D. Colo. 1999) (holding that while "class members are not considered parties for purposes of traditional discovery measures," limited discovery of class members will be allowed "in the form of questionnaires"); *Long v. Trans World Airlines Inc.*, 761 F. Supp. 1320, 1329-31 (N.D. Ill. 1991) (finding discovery of absent class members by sampling necessary and appropriate in determining damage claims); *Transamerican Ref. Corp. v. Dravo Corp.*, 139 F.R.D. 619, 622 (S.D. Tex. 1991) (permitting discovery from 50 of 6,000 absent class members).

## DISCUSSION

Having carefully considered Defendant's request, I find that the limited discovery proposed is warranted.  To start, the information sought is relevant and goes to class-wide issues.  Specifically, the proposed discovery seeks to determine, among other things, whether there are differences among class members as to what their respective religions permit in

terms of removal of head coverings and whether the removal for purposes of taking the police photograph was a "substantial" as opposed to some lesser burden on their religion.  The discovery will allow Defendant to explore whether there should be subclasses based on religion or based on the specific head covering.  Indeed, Plaintiffs do not dispute that the vast majority of the class are not Muslim women but men of various faiths, and that there is a range of head coverings at issue.  Nor do Plaintiffs dispute that the number of individuals may be fewer than 5,000 if it is discovered some of the head coverings were not worn for religious purposes.  The discovery may allow Defendant to argue as a factual matter that the burden of the policy on religion differs based on religion and/or gender—an issue that goes to liability and information needed for trial.

The discovery proposed is also narrowly tailored, although the Court finds that it can be further narrowed.  The Defendant proposes 50 depositions of no more than two hours in length.  In class actions, it is not uncommon to have more than 70 hours of fact deposition (10 witnesses x 7 hours).  Here, Defendant is proposing a maximum of 100 hours of deposition.  The Court finds that two hours of deposition is likely unnecessary for the questions that Defendant needs to ask.  The Court envisions some introductory questions to confirm that the individual remembers being arrested and the circumstances of being photographed for the official police photograph; a question about the type of head covering worn at the time of the photograph; a few questions to confirm that the head covering was worn for religious reasons with an explanation of what the deponent's religion requires in terms of the head covering and the

reasons therefor, including on the day of the arrest and police photograph[4]; a few questions to learn whether the deponent's religion permits removal of the head covering and under what circumstances; and finally, a few questions about how the removal of the head covering impacted the deponent at the time.  The above can be done in about 1.5 hours, which would result in 75 hours of deposition testimony.  The attorney time and cost for these depositions is small in comparison to the millions of dollars in damages sought by Plaintiffs for the class.

While the depositions represent a burden to class members, the burden is not significant in light of the class size—Defendants are not seeking to question all 5,000 class members but rather to question only 50.  Further, the burden and cost on class members who are deposed can be minimized if the depositions are taken by video via a remote platform. None of the questions will require any class member to retain personal counsel or to consult an expert.

Finally, it is clear based on the deposition testimony that the lead Plaintiffs do not know the tenets of other religious faiths and the circumstances when individuals of other faiths may remove their head coverings. Defendants will be permitted to explore possible defenses based on differences in class members' religion.  Further, contrary to what Plaintiffs contend, the discovery sought is not to explore the sincerity of any class member's individual religious beliefs; rather, it is to understand whether there are differences between and among groups of class members based on religion that bear on the degree of burden experienced by having to remove a religious head covering for an official police purpose, and whether any such

---

[4] Some of the individuals deposed may state they do not wear a religious head covering at all times or were not wearing a head covering for religious reasons.

differences warrant creation of subclasses for trial.  While it is true the questions also will bear on damages of the individual deponents, the questions overlap with liability and class issues, including possible damages subclasses, and therefore will be permitted.

Plaintiffs had urged this Court to defer deciding on absent class member depositions until the parties' experts could weigh in, suggesting that the expert testimony would be dispositive.  The Court granted this request.  However, as discussed above, the parties' experts disagree that all religions have the same requirements concerning head coverings and that the degree of burden is the same for all class members.  Because expert discovery was not conclusive on the issue, this supports allowing Defendants the opportunity for limited discovery to potentially develop facts in support of their defenses and the appropriateness of the creation of subclasses.

## CONCLUSION

For the above stated reasons, the discovery request is granted subject to the limitations set forth above.  The depositions shall be completed by **February 28, 2023**.  This terminates the motions at ECF 214 and 255.

**SO ORDERED.**

Dated: New York, New York
      December 8, 2022

                                    _Katharine H. Parker_____
                                      KATHARINE H. PARKER
                                      United States Magistrate Judge