UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMILLA CLARK and ARWA AZIZ, on Behalf
of Themselves and Others Similarly Situated, and
TURNING POINT FOR WOMEN AND
FAMILIES,

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant.

Case No.: 18-cv-02334 (AT)(KHP)

---

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ......................................................................................iii-iv

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 2

PROCEDURAL HISTORY........................................................................................ 4

    I.    THE PARTIES ENTER A PARTIAL SETTLEMENT
         CHANGING THE POLICY ........................................................... 4

    II.   THE COURT GRANTS CLASS CERTIFICATION................................. 5

    III.  THE COURT DENIES THE CITY'S MOTION TO DISMISS.............................. 5

ARGUMENT ............................................................................................................. 6

    I.    THE POLICY VIOLATED RLUIPA........................................................ 7

         A.    THE POLICY SUBSTANTIALLY BURDENED CLASS
              MEMBERS' RELIGIOUS BELIEFS......................................... 8

         B.    THE POLICY FAILS STRICT SCRUTINY ........................... 12

             1.   The Policy Did Not Serve a Compelling Government
                 Interest..................................................................... 12

             2.   The Policy Was Not the Least Restrictive Means of
                 Serving Safety or Identification ........................................ 13

    II.   THE POLICY VIOLATED THE FREE EXERCISE CLAUSE.............................. 15

         A.    THE POLICY DID NOT SERVE THE CITY'S INTERESTS
              IN IDENTIFICATION ........................................................ 16

         B.    PLAINTIFFS HAVE NO ALTERNATE MEANS OF
              EXERCISING  THEIR RIGHT TO WEAR A RELIGIOUS
              HEAD COVERING......................................................... 17

         C.    ALLOWING PLAINTIFFS TO RETAIN THEIR HEAD
              COVERINGS WOULD NOT BURDEN NYPD RESOURCES ............... 18

         D.    ALLOWING PLAINTIFFS TO RETAIN THEIR HEAD
              COVERINGS WOULD FURTHER THE CITY'S INTEREST ................ 20

III.   THE POLICY VIOLATED THE NEW YORK STATE CONSTITUTION........... 20

     A.    THE POLICY VIOLATES ARTICLE I, SECTION 3............................... 20

     B.    A PRIVATE RIGHT OF ACTION IS NECESSARY TO
          PROTECT  PLAINTIFFS' RIGHTS............................................................ 23

CONCLUSION........................................................................................................... 24

TABLE OF AUTHORITIES

**Cases**

*Ackridge v. Aramark Corr. Food Servs.*,
    No. 16 Civ. 6301, 2018 WL 1626175 (S.D.N.Y. March 30, 2018)............................ 21, 23

*Benjamin v. Fraser*,
    264 F.3d 175 (2d Cir. 2001)........................................................................ 17

*Brandon v. Kinter*,
    938 F.3d 21 (2d Cir. 2019)......................................................................... 11

*Catholic Charities of Diocese of Albany v. Serio*,
    7 N.Y. 3d 510 (2006) .......................................................................... 22, 23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................. 6

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
    915 F. Supp. 2d 574 (S.D.N.Y. 2013)............................................................. 23

*Ford v. McGinnis*,
    352 F.3d 582 (2d Cir. 2003)............................................................... 8, 10, 11

*G.E. v. City of New York*,
    No. 12 Civ. 5967, 2017 WL 4357340 (E.D.N.Y. Sept. 29, 2017).................................. 14

*Holt v. Hobbs*,
    574 U.S. 352 (2015)........................................................................... 12, 15

*Immuno AG. v. Moor-Jankowski*,
    77 N.Y. 2d 235 (1991) ............................................................................ 24

*In re Miller*,
    684 N.Y.S. 2d 368 (4th Dep't 1998)........................................................... 21, 22

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)......................................................................... 8

*Jova v. Smith*,
    582 F.3d 410 (2d Cir. 2009)................................................................... 12, 14

*Khatib v. Cnty. of Orange*,
    639 F.3d 898 (9th Cir. 2011) ...................................................................... 7

*McEachin v. McGuinnis*,
    357 F.3d 197 (2d Cir. 2004)........................................................................ 8

*Rourke v. New York State Dep't of Correctional Servs.*,
    159 Misc. 2d 324 (Sup. Ct. Albany Cnty. 1993) ............................................................. 21

*Seabrook v. City of New York*,
    No. 99 Civ. 9134, 1999 WL 694265 (S.D.N.Y. Sept. 7, 1999) ....................................... 21

*Soliman v. City of New York*,
    No. 15 Civ. 5310, 2017 WL 122973 (E.D.N.Y. Mar. 31, 2017) ..................................... 23

*Town of Islip v. Caviglia*,
    141 A.D. 2d 148 (2d Dep't 1988) ................................................................................... 23

*Turner v. Safley*,
    482 U.S. 78 (1987) .................................................................................................... 16, 17

*U.S. v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) ........................................................................................................ 14

*Valdez v. City of New York*,
    No. 11 Civ. 05194, 2013 WL 8642169 (S.D.N.Y. Sep. 3, 2013) ................................... 16

*Vazquez v. Maccone*,
    No. 12 Civ. 4564, 2016 WL 2636256 (E.D.N.Y. 2016) .................................................... 7

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ......................................................................................... 14

*Washington v. Klem*,
    497 F.3d 272 (3d Cir. 2007) ........................................................................................... 12

*Westchester Day Sch. v. Vill. of Mamaroneck*,
    417 F. Supp. 2d 477 (S.D.N.Y. 2006) ...................................................................... 13, 14

*Westchester Day Sch. v. Vill. of Mamaroneck*,
    504 F.3d 338 (2d Cir. 2007) ............................................................................................. 8

*Williams v. Annucci*,
    895 F.3d 180 (2d Cir. 2018) ........................................................................................... 12

*Zargary v. City of New York*,
    607 F. Supp. 2d 609 (S.D.N.Y. 2009) ...................................................................... 11, 16

**Statutes**

42 U.S.C. § 2000cc-1 ............................................................................................................ 7

**Constitutional Provisions**

N.Y. Const. Art. 1, § 3 ......................................................................................................... 20

## PRELIMINARY STATEMENT

This Court previously found—in its decision denying the City's motion to dismiss—that New York's policy to force the removal of religious head coverings for booking photographs violated the Religious Land Use and Institutionalized Persons Act and both the federal and state constitutions. Dkt. 177 at 1. Factual discovery has now fortified the Court's legal conclusion. After document discovery, depositions of both parties' religious experts, depositions of both class representatives, depositions of seven absent class members, and the mailing of five hundred surveys to absent class members, three bedrock tenets remain: (1) wearing a religious head covering is a form of religious expression; (2) the forced removal of a religious head covering interferes with that religious expression; and (3) the City's old policy forced anyone wearing a religious head covering to be stripped of that head covering for booking photographs.

The forced removal of a religious head covering interferes with a person's religious choice and being forced to remove a marker of one's religious identity and commitments is manifestly harmful. Both parties' experts agreed on both these principles. Moreover, both class representatives and every absent class member the City deposed testified that they wore religious head coverings as an expression of their religious belief and that the forced removal of their religious head coverings interfered with those religious choices. Class members described feeling violated, traumatized, and naked after being forced to remove their religious head coverings.

The terms of the City's former policy—which have never been in dispute—stated that where an individual refuses to remove their religious head covering for official department photographs, the arresting officer will inform them that their head covering "must be removed." The NYPD justified that removal as necessary for its security and identification interests. But when challenged for why it could not have a less restrictive policy, the City had no answer, and it is undisputed that other government and law enforcement entities across the country including

the United States Department of State, United States Citizenship and Immigration Services and the Department of Motor Vehicles all allow religious head coverings in photographs to be used for substantially the same purposes.

It cannot be meaningfully disputed that the forced removal of a religious head covering is a substantial burden on the religious exercise of class members, did not serve a compelling interest and was not the least restrictive means to serve those interests. The Supreme Court has noted that establishing a burden on religious exercise is a low bar. This Court has recognized that, taking the allegations as true, the policy violated the class's religious rights. Discovery has borne this out.

On this record, summary judgment should be granted on the question of liability for violations of the Religious Land Use and Institutionalized Persons Act and both the federal and state constitutions.

## STATEMENT OF FACTS

This case arises from New York's policy of forcing people to remove their religious clothing for custodial arrest photographs.

Under Interim Order 29, New York's Police Department forced all people they arrested to remove their head coverings—including religious head coverings—for photographs during the booking process (the "Policy"). ¶ 5;[1] Ex. 1 (Interim Order 29), at ¶ 36(c); Ex. 2 (Defs. Resp. to Pls. RFA) at 10 (No. 20).

The Policy specifically required removal of religious head coverings and provided that, where an arrestee indicated a preference to retain one, they must be informed that "the

---

[1]      Unless otherwise indicated, all factual citations to "¶ __" refer to paragraphs in Plaintiffs' statement of undisputed material facts pursuant to Fed. R. Civ. P. 56.1 (Dkt. 257), and all exhibit citations are citations to the Declaration of O. Andrew Wilson dated September 5, 2023.

Department is required to take an official Department photograph at the borough Court Section in which the arrestees head covering *must be removed*." Ex. 1 at 2 (emphasis added). According to the Policy, "the Department requires that an official photograph be taken of an arrestee with an unobstructed view of the arrestee's head, ears, and face." Ex. 1 at 1. The Policy contemplated that people could ask to have their photograph taken in private but that required transport to One Police Plaza and, if someone asked to use this accommodation, the Policy indicated the person "will be informed that their arrest processing may be delayed due to operational requirements." Ex. 1 at 2.

In stark contrast to the NYPD Policy, other government and law enforcement entities across the country—including the United States Department of State, United States Citizenship and Immigration Services and the Department of Motor Vehicles—allow people to keep their religious head coverings on when taking identification photographs. ¶ 20-22; Dkt. 177 at 15.

On its face, the Policy applied to all religious head coverings in the same way, regardless of religion and without exception. ¶ 8; Ex. 2 at 11 (No. 22).

Wearing a religious head covering is an expression of a religious belief. ¶ 1. Both Plaintiffs' and Defendant's experts agreed that forced removal of a religious head covering interferes with a person's religious choice. Ex. 3 (Expert Report of Elizabeth Bucar) at 9; Ex. 4 (Dep. Transcript of Ahmed El Shamsy) at 91:16-21. Both experts also acknowledged "the general harm of being forced to remove a marker of one's religious identity and commitments" that comes with the forced removal of religious head coverings. Ex. 5 (Expert Report of Ahmed El Shamsy) at 5; Ex. 3 at 10 (involuntary removal of religious head coverings "causes unique harm along the same three axes of ritual, identity, and morality").

The City provides two explanations for the Policy to force people to take actions against their beliefs: security and identification. ¶ 9; *see also* Ex. 6 (Callaghan Declaration) at ¶ 8. But at its deposition, the City collapsed these two explanations into identification (Ex. 8 (Dep. Transcript of Czark) at 15:17-23) and then acknowledged that a photo of an arrestee in their ordinary appearance (wearing a head covering) was sufficient to identify the individual. *Id.* at 31:24-32:7.

## PROCEDURAL HISTORY

The named Plaintiffs, Ms. Clark and Ms. Aziz, filed this case on March 16, 2018 to challenge the City's Policy under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the Free Exercise Clause of the United States Constitution, and the New York State Constitution. Dkt. 1.

## I.    THE PARTIES ENTER A PARTIAL SETTLEMENT CHANGING THE POLICY

On October 26, 2020, the parties filed a comprehensive injunctive settlement with the Court that has fundamentally changed the way the NYPD treats people who wear religious head coverings. Dkt. Nos. 148; 148-1. The NYPD changed its policy and adopted Patrol Guide Procedure No. 208-83 ("New Policy") which remains in effect today. ¶17; Ex. 2 at 8 (No. 13-14). The New Policy permits all arrestees to retain their religious head covering unless they fall within limited exceptions where specific evidence would be obscured by a head covering or a person was arrested outside of their home without a head covering. Ex. 7 (Patrol Guide Procedure No. 208-83) at 1. The purpose of the New Policy is the same as Interim Order 29: to maintain photographs of arrestees for identification throughout the arrest process. Ex. 2 at 8 (No. 15). The City has conceded that nothing prevented them from enacting this less-restrictive policy sooner. When asked what circumstances changed that allowed the City to adopt the new, less

4

burdensome policy in August 2021, the City's witness testified "The new procedure came out August of 2021...that's what changed." Ex. 8 (Dep. Transcript of Czark) 33:3-7.

## II.    THE COURT GRANTS CLASS CERTIFICATION

This Court, on February 16, 2021, certified a class consisting of all persons who were required to remove their religious head coverings for post-arrest photographs under the NYPD's prior policy. Dkt. 157 at 1, 11. The Court held that the two Muslim women were adequate class representatives for people who wore other religious head coverings. Dkt. 157 at 5-6; 9. The Court reasoned that "[t]he proposed class members are unified by a common legal theory and by common facts: they all argue that the Policy is unconstitutional and that each was allegedly subjected to removing their religious headgear in violation of their sincerely held religious beliefs." Dkt. 157 at 11.

## III.    THE COURT DENIES THE CITY'S MOTION TO DISMISS

The Court later denied the City's motion to dismiss on the grounds that the United States Constitution does not permit the NYPD to require people to remove their religious head coverings for arrest photos. Dkt. 177 at 1. The Court held that even under the lowest standard of review, "where courts tend to accept the City's stated justification for a policy, the Court would conclude that the Policy violates the First Amendment." *Id.* at 14.

In so finding, this Court reasoned through each prong of the Free Exercise analysis. First, it expressed skepticism towards whether the Policy furthered the City's interest in maintaining an accurate photographic record, observing that the Policy "requires an arrestee to alter 'her ordinary appearance *before* she is photographed (*i.e.*, remove the hijab she customarily wears, will replace immediately after she is photographed, and plans to wear while in custody),' making a later identification more difficult." *Id.* at 14 (emphasis in original). Second, this Court observed that Plaintiffs had no alternative means of exercising their right to wear their religious head

coverings in public. *See id*. at 14. Third, this Court noted that "permitting observant Muslim women to wear a hijab while being photographed as part of booking procedure would have reasonably accommodated their beliefs and also would be less burdensome on the NYPD." *Id.* at 14. And fourth, this Court observed that "[a]llowing an arrestee to maintain her ordinary appearance in a Booking Photograph does not undermine the legitimate interest of keeping a photographic record of arrestees" and pointed towards numerous state and federal law enforcement agencies that allow for religious head coverings in identification photographs. *Id.* at 14-15.

This Court's analysis is applicable to the entire Plaintiff class. For example, it reasoned that "snapping a Booking Photograph of an arrestee with her religiously compelled covering would expend fewer resources than 'requir[ing] dialogue with arrestees and additional time spent negotiating removal.'" *Id.* at 14. And in fact, "photographing the arrestee in her ordinary appearance likely *furthers* law enforcement's interest in identification—rather than impeding such interest—because arrestees who have a sincere religious belief that requires them to wear a head covering are likely to be wearing that same covering when the need to identify them arises." *Id.* at 15. This Court also observed the Policy's under-inclusiveness, noting that "arrestees who do not wear a head covering are equally capable, if not more capable, of making changes to their appearances after a Booking Photograph by switching hairstyles or facial jewelry." *Id.*

Plaintiffs now move for partial summary judgment on the legal question of whether the Policy was contrary to RLUIPA and the federal and state constitutions.

## ARGUMENT

Summary judgment is appropriate when there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Here, after both expert and fact

discovery has concluded, there remains no dispute of material fact concerning the terms and impact of the Policy. As the Court held in its decision denying the City's motion to dismiss, the Policy violated RLUIPA, the Free Exercise Clause, and the New York State Constitution.

## I.    THE POLICY VIOLATED RLUIPA

The Policy violated RLUIPA because it substantially burdened class members' sincerely held religious beliefs and did not further the City's interest through the least restrictive means.

RLUIPA applies where (1) the government imposes "a substantial burden" (2) "on the religious exercise of a person" (3) "confined to an institution." 42 U.S.C. § 2000cc-1. Where a plaintiff establishes these prongs, the government must demonstrate that the Policy satisfies strict scrutiny. *See id.* Here, class members meet the third prong—confined to an institution—because they were held at NYPD precincts or One Police Plaza.[2]  As there is no meaningful dispute that forcibly removing class members' religious head coverings burdened their sincerely held religious beliefs, the analysis then turns to whether the Policy fails strict scrutiny. It does. The Policy failed to serve a compelling interest in identification or security and, in any case, was not the least restrictive means to serve those interests.

---

[2]      The NYPD held class members in NYPD precincts and One Police Plaza. Both are institutions under the statute which includes "a jail, prison, or other correctional facility [or] a pretrial detention facility." *Khatib v. Cnty. of Orange*, 639 F.3d 898, 902-3 (9th Cir. 2011) (*en banc*). Both locations would, under the common meaning of the terms, fall within the definition of "pretrial detention facility." *See id.* at 903 ("the common, ordinary meaning of a 'pretrial detention facility' is precisely what the phrase suggests: a facility where individuals who are not yet convicted are held pending court proceedings."); *see also Vazquez v. Maccone*, No. 12 Civ. 4564, 2016 WL 2636256, at *7 n.6 (E.D.N.Y. 2016) (noting that RLUIPA applied where plaintiff was held at the New York State Police Barracks as an arrestee for processing.). Here, class members were arrested and held temporarily pending further proceedings in locations constituting pretrial detention facilities and institutions under RLUIPA.

**A.      The Policy Substantially Burdened Class Members' Religious Beliefs**

Wearing a religious head covering is a sincere religious belief; forcing class members to remove that head covering for photographs pursuant to the Policy was a substantial burden on that belief.

Courts do not scrutinize the sincerity of an individual's religious beliefs. *See Ford v. McGinnis*, 352 F.3d 582 (2d Cir. 2003) ("courts are singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs.") (internal quotations omitted); *see also Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996) ("Our scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature.").

The substantial burden analysis under RLUIPA is the same as under the Free Exercise Clause. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007). Demonstrating a substantial burden is "not a particularly onerous task." *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004). A substantial burden on religious belief is one that "places substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly,* 76 F.3d at 477.

Here, the class includes only people who wore religious head coverings pursuant to their religious beliefs. Dkt. 157. The City forced them to "modify [their] behavior" and "violate [their] beliefs" by forcibly removing their religious head coverings. *Jolly*, 76 F.3d at 477. Class members had "no alternative means" of exercising their right to wear their religious head coverings in public. Dkt. 177 at 14. That, as a matter of law, is a substantial burden.

Moreover, the factual record demonstrates this burden. Both parties' experts agreed that the forced removal of a religious head covering can have profound impacts on an adherent's sense of self and their practice of religion across different communities. For example, Plaintiffs' expert, Professor Bucar wrote that coerced removal can be "experienced as an affront to one's

core values, sense of self, and even orientation in the world. Like voyeurism, forced removal of a religious head covering results in embarrassment and humiliation. It is an affront to one's dignity." *See* Ex. 3 at 9. The City's expert, Professor El Shamsy's report echoed similar sentiments: "[f]or a Muslim or Jewish woman who covers her hair to be forced to remove her head covering in the presence of unrelated men not only violates a religious tenet that she is committed to observing but can also entail a personal sense of bodily violation." Ex. 5 at 4. Professor El Shamsy further acknowledged the "general harm of being forced to remove a marker of one's religious identity and commitments" as an additional injury beyond the sense of bodily violation. *Id.* at 5.

The class representatives support the experts' findings. As Ms. Aziz explained, "if somebody who is Godfearing" chooses "to wear some kind of religious aspect on their head in front of all the world to see . . . they're going to get affected if they're going to get stripped from it," regardless of whether the head covering is a yarmulke, kufi, or hijab. Ex. 9 (Dep. Transcript of Arwa Aziz) 101:3-7; 99:12-18. Ms. Clark echoed that testimony: "I understand that the damages the class suffered were similar to mine in that they had a religious head covering removed for an arrest photograph and it created some sort of trauma for them." Ex. 10 (Dep. Transcript of Jamilla Clark) 105:18-21.

Moreover, every class member that the City has interviewed testified that they wear a religious head covering as an expression of their religious belief and that the forced removal of their religious head coverings interfered with their religious choices. Ex. 11[3] (Dep. Transcript of V.Mc.) at 61:1-15; Ex. 12 (Dep. Transcript of M.C.) at 26:17-23; Ex. 13 (Dep. Transcript of

---

[3] Defendants deposed class members pursuant to Court-ordered absent class discovery after the parties exchanged and submitted 56.1 statements. All exhibit citations here are citations to the Declaration of O. Andrew Wilson dated September 5, 2023.

K.P.B.) at 48:3-11; Ex. 14 (Dep. Transcript of Y.A.G.) at 32:5-9; Ex. 15 (Dep. Transcript of

V.Mo.) at 31:22-32:5; Ex. 16 (Dep. Transcript of R.W.) at 26:22-27:10; 29:4-12. Class members

described feeling violated, traumatized, and naked after being forced to remove their religious

head coverings. Ex. 11 at 53:19-54:1 ("I felt violated. I felt disturbed…I felt disgusted…I was

hurt and I was aggravated."); Ex. 12 at 29:12-19. ("I was just frustrated and felt violated…I

feel—felt like I was naked in front of people."); Ex. 13 at 49:22-50:11 ("I felt—dehumanized…I

felt disrespected, humiliated…traumatized."); Ex. 14 at 32:11-20 ("it is demeaning to be, you

know, to have something that is important to you, to have something that you are still wearing or

that has religious value, to be told to take it off."); Ex. 16 at 40:25-41:1 ("I felt violated.")

Forced removal of a religious head covering burdens a class member's religious practice,

regardless of the tenets governing an individual's faith. Any disagreement regarding the precise

theological requirements concerning head coverings is irrelevant and ignores the actual scope of

the class. As this Court already noted, "Plaintiffs' class definitionally only includes those who

were required to remove a religious head covering while in NYPD custody…further obviating

the need for the Court to inquire into each individual's religious belief." ECF No. 167, at 6.

Whether a religious practice is *mandatory* is both unnecessary under RLUIPA and in

many cases, inappropriate. *Ford,* 352 F.3d at 593. As the Second Circuit reasoned in *Ford*,

confining religious protection "to only those religious practices that are mandatory would

necessarily lead us down the unnavigable road of attempting to resolve intra-faith disputes over

religious law and doctrine." *Id.* While the City's expert report focused on doctrinal differences

amongst the religious justification for head coverings, he conceded that the removal of a

religious head covering interferes with the religious choice to wear that head covering –

regardless of the premise for that choice. Ex 4, 91:16-21 ("Q: And (responding, over objection to

the question) "do you agree that the coerced removal of a religious head covering interferes with that portion of the person's choice, which is religious?..." with the answer: "[a]s a general statement, sure.").

Finally, even a single infringement on a religious practice can qualify as a substantial burden. *See Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) ("Indeed, it would be absurd to require that courts, in order to determine what constitutes a substantial burden, be made to decide the number of violations of a particular religious tenet that make a sin grievous."). If class members were forced to remove their head covering only once, that forced removal is still a substantial burden under RLUIPA. *See Ford*, 352 F.3d 591 (finding that a denial of a single ritual feast constituted a substantial burden.).[4]

There is no dispute that all class members were forced to remove religious head coverings for post-arrest photographs while in NYPD custody. There is no dispute that the Policy applied to all religious head coverings in the same way regardless of the arrestee's religion. *See* ¶ 8; Ex. 2 at 11. Accordingly, there remains no meaningful dispute that the forced removal of a religious head covering substantially burdened class members' religious practice under RLUIPA.

---

[4]    These arguments were not considered by one of the only courts to hold otherwise in the religious head covering context. *Zargary v. City of New York*, 607 F. Supp. 2d 609, 612 (S.D.N.Y. 2009). The *Zargary* court relied heavily on the pre-RLUIPA, more deferential standard of free exercise, minimizing the burden on the plaintiff to remove her religious head covering. Moreover, the legal landscape has changed since *Zargary* was decided. Since then, Congress and government agencies explicitly allow religious head coverings for identification photographs and police departments across the country allow arrestees to wear religious head coverings for booking photographs. *See* Dkt. 177 at 15. In light of these changes, the *Zargary* court's reasoning that retaining religious head coverings for photographs still poses a "risk of failing to identify inmates" does not pass muster and the Court should not follow it here. *Zargary*, 607 F. Supp. 2d at 613.

### B.     The Policy Fails Strict Scrutiny

The Policy fails strict scrutiny because neither of the City's proffered interests in removing religious head coverings— "proper identification" and "maintaining safety and security of those in custody" Ex. 6 (Callaghan Dec.) ¶ 8; *see also* ¶ 9—was served by the Policy. Under oath, the City collapsed these concepts, stating that the City's interest in security before an individual's arraignment "wasn't so much for safety, it was for the security and identification purposes that [they] present the right defendant in front of the judge every single time." Ex. 8 at 15:17-23. In that sense, the City's interest in identification and security pre-arraignment served the same purpose, which was to make sure that the City presented the correct person to the judge. Ex. 8 at 17:6-19. These identification interests are not served by the Policy, and, regardless, the Policy was not the least restrictive means to achieve those ends.

### 1.     The Policy Did Not Serve a Compelling Government Interest

Taking and maintaining photographs without religious head coverings for all arrestees did not serve the identification interests upon which the City tries to justify the Policy.

Under RLUIPA, the state cannot "merely reference an interest in security or institutional order" but rather "the particular policy must further this interest." *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (quoting *Washington v. Klem*, 497 F.3d 272, 283 (3d Cir. 2007)). Furthermore, "[e]vidence of a policy's underinclusiveness relative to 'analogous nonreligious conduct' may cast doubt on both whether the government's asserted interest is compelling." *Williams v. Annucci*, 895 F.3d 180, 189 (2d Cir. 2018) (citing *Holt v. Hobbs*, 574 U.S. 352, 367-68 (2015)). In *Hobbs*, the Supreme Court noted that a grooming policy was underinclusive by prohibiting individuals from growing a half-inch beard because of security risks but did not require individuals to go bald, barefoot, or naked even though clothing and shoes are more plausible places to hide contraband. *See Holt*, 574 U.S. at 367.

Here, the City defined its security interest as being able to identify an arrestee for purposes of producing them for arraignment. *See* Ex. 8 at 15:14-23; 17:6-19. But an identification photograph without a religious head covering does not reflect someone's ordinary appearance. As this Court noted, the Policy "requires an arrestee to alter 'her ordinary appearance *before* she is photographed'…making a later identification more difficult." Dkt. 177 at 14-15 (emphasis in original). In fact, "photographing the arrestee in her ordinary appearance [wearing religious head coverings] likely *furthers* law enforcement's interest in identification—rather than impeding such an interest—because arrestees who have a sincere religious belief that requires them to wear a head covering are likely to be wearing that same covering when the need to identify them arises." Dkt. 177 at 15 (emphasis in original). In fact, as the City acknowledged, under the New Policy, a photo of an arrestee in their ordinary appearance (wearing a head covering) is sufficient to identify the individual later. Ex. 8 at 31:24-32:7. This is evidence the City could have had a less burdensome policy at the time.

As this Court noted, arrestees who do not wear religious head coverings "are equally capable, if not more capable, of making changes to their appearances after a Booking Photograph by switching hairstyles or facial jewelry." Dkt. 177 at 15. And yet, the Policy did nothing to further its identification interest with respect to analogous nonreligious conduct. This under-inclusiveness is further proof that the City's interest in identification is not served by the Policy.

### 2.    The Policy Was Not the Least Restrictive Means of Serving Safety or Identification

The Policy also fails strict scrutiny because it was unnecessarily restrictive. To establish that a policy uses the least restrictive means, a defendant must show there are no alternatives that would further its alleged interest. *See Westchester Day Sch. v. Vill. of* Mamaroneck, 417 F. Supp. 2d 477, 550 (S.D.N.Y. 2006). In other words, "if a less restrictive means is available for the

Government to achieve its goals, the Government must use it." *Id.* at 550 (quoting *U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)).

Here, the City admitted that a photograph retaining a religious head covering would be sufficient for identification purposes during transport from the precinct to Central Booking. *See* Ex. 8 at 31:24-32:7; 32:22-33-7; Ex. 6 at ¶ 1. In its corporate deposition, the City conceded that nothing prevented it from enacting its currently less restrictive policy sooner:

> Q:    You testified earlier that it's currently adequate to take a photograph of the oval of the face for identification purposes, but it wasn't adequate under Interim Order 29. What changed between then and now?
>
> A:    The new procedure came out August of 2021. That's—that's what changed.

Ex. 8 at 32:22-33:7.

Rule 407 explicitly provides that the court may admit evidence like this of a subsequent remedial measure to prove feasibility of certain measures. FRE 407. *See also G.E. v. City of New York*, No. 12 Civ. 5967, 2017 WL 4357340, at * 6 (E.D.N.Y. Sept. 29, 2017) (noting the fact that the City changed its policy to provide an accommodation was relevant to the Free Exercise analysis).

Far from being the least restrictive means, the old Policy was one of the *most* restrictive means to try to achieve the City's interests, especially where alternatives have been adopted by other agencies to serve the same purpose. "[T]he failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means." *Jova,* 582 F.3d at 416 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1000 (9th Cir. 2005)).

14

As this Court noted, the United States Department of State, the United States Citizenship and Immigration Services, and the Department of Motor Vehicles all allow religious head coverings in photographs used for identification without issue. *See* Dkt. 177 at 15. Moreover, police departments in Michigan, California, Minnesota, and Maine also allow arrestees to wear religious head coverings for booking photographs. *See id.* Where the same institutions in other jurisdictions are able to offer accommodations to serve the same interests, the City must, "at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt*, 574 U.S. at 368-69.

Here, the City has not provided any explanation for why it could not have adopted a less restrictive means to achieve its stated end of identification. To the contrary, the City provides no reason why taking and maintaining photographs without religious head coverings was necessary to serve its interest, at all.

Because there is no material dispute of fact that the Policy failed to serve a compelling state interest through the least restrictive means, it fails strict scrutiny and summary judgment should be granted on liability under RLUIPA.

## II. THE POLICY VIOLATED THE FREE EXERCISE CLAUSE

The City's Policy also fails rational basis review under the Free Exercise Clause of the U.S. Constitution because, as this Court observed, the Policy "[did] not serve any legitimate City interest and directly impede[d] [Plaintiff's] sincerely-held belief..." Dkt. 177 at 17.

Under rational basis review, courts evaluate whether (1) the policy has a rational relationship to a legitimate government objective; (2) there are alternate means of exercising the burdened right; (3) the accommodation of the right will impact government personnel and prison resources; and (4) there is a ready alternative that would have only a *de minimis* effect on the

asserted government objective. *See Turner v. Safley*, 482 U.S. 78, 84 (1987); *see also* Dkt. 177 at 13. There remain no material disputes concerning any of these four prongs.

### A.    The Policy Did Not Serve the City's Interests in Identification

While the City may have a legitimate governmental objective in maintaining an arrestee photographic record, the Court has already found that the Policy "bears no reasonable relationship to the City's alleged security interest." Dkt. 177 at 13. *See Turner*, 482 U.S. at 89-90 ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.").

As explained above (Part I.B(1)), the Policy requiring arrestees remove a religious head covering does not have a logical connection to serve interests in security and identification. In fact, the Policy likely *impeded* this interest because the Policy "require[d] the arrestee to alter 'her ordinary appearance *before* she is photographed (*i.e.* remove the hijab she customarily wears, will replace immediately after she is photographed, and plans to wear while in custody),' making a later identification more difficult." Dkt. 177 at 14-15 (emphasis in original). Moreover, given the many other ways an arrestee can alter their appearance through hairstyles and jewelry, forced removal of a religious head covering did not rationally serve the City's claimed interest in maintaining an accurate photographic record. *See* Dkt. 177 at 14-15.

The Court should be even more critical of the Policy's relationship to the City's interests to account for the stark difference between the pre-trial, pre-arraignment context and post-conviction context. The degree of deference typically due in the penological context would be improper if applied to policies governing mere pre-arraignment detention. "[T]hese different contexts require the application of different legal standards." *Valdez v. City of New York*, No. 11 Civ. 05194, 2013 WL 8642169, at *8 n.5 (S.D.N.Y. Sep. 3, 2013); *see also Zargary,* 607 F. Supp. 2d at 612, *aff'd*, 412 F. App'x 339, 341-342 (2d Cir. 2011) (applying a "reasonableness test *less*

16

restrictive than that ordinarily applied" because "the challenged regulation is penological and because plaintiff was an inmate when the regulation was applied to her") (emphasis added).

For example, in the Sixth Amendment context, the Second Circuit noted that "*Turner* involved convicted prisoners rather than pretrial detainees, and the standard it promulgated depends on 'penological interests,'" defined as "interests that relate to the treatment…of persons *convicted* of crimes." *Benjamin v. Fraser*, 264 F.3d 175, 187 n.10 (2d Cir. 2001) (emphasis added). "Penological interests are therefore arguably not an appropriate guide for the pretrial detention of accused persons." *Id.* The Ninth Circuit similarly highlighted this distinction in the Due Process context, noting that "*Turner* dealt with convicted prisoners, not pretrial detainees." *Demery v. Arpaio*, 378 F.3d 1020, 1028-29 (9th Cir. 2004). Given the difference in the penological and pre-trial contexts, the Court should afford *less* deference to the City's interests in security and identification of pre-arraignment arrestees where a Policy infringed on Plaintiffs' constitutional rights.

### B. Plaintiffs Have No Alternate Means of Exercising Their Right to Wear a Religious Head Covering

Plaintiffs had no alternative means of exercising their right to wear their religious head covering because the Policy *required* complete removal for photographs. *See* Dkt. 177 at 14-15; ¶ 5. Religious head coverings are physical manifestations of religious beliefs and are worn as acts of worship, to create and communicate religious identity, or as part of commitments to keep certain body parts private. Ex. 3 at 4-7. For example, the Court recognized that women who wore hijab had no alternative means of exercising their right to wear their head coverings in public, at all times. This is equally applicable to all members of the class who were forced to remove religious head coverings that they wore in public as part of their sincerely held religious beliefs.

Class members who wore their religious head coverings in public were forced, under the clear terms of the Policy, to remove their head coverings and take an uncovered photograph. *See* ¶ 1 (Defs. Statement of Additional Material Facts); Ex. 1 at 2 (where an arrestee refuses to remove their religious head covering for photograph, "[t]he arresting officer will inform the arrestee that the Department is required to take an official Department photograph at the borough Court Section in which the arrestees head covering must be removed.").

### C. Allowing Plaintiffs to Retain Their Head Coverings Would Not Burden NYPD Resources

Allowing arrestees to maintain their religious head covering would "reasonably accommodate [] their beliefs" and would be "less burdensome on the NYPD." Dkt. 177 at 14-15.

One of the ironies of this case is that the Policy was *more* burdensome than a reasonable accommodation. As this Court observed, "snapping a Booking Photograph of an arrestee with her religiously compelled covering would expend fewer resources than 'requir[ing] dialogue with arrestees and additional time spent negotiating removal.'" Dkt. 177 at 15. The City admits that where an individual refused to remove a religious head covering at Central Booking, the NYPD would have to transport the arrestee to a separate location in Manhattan to take an uncovered photograph. ¶ 13; *see also* Ex. 8 (Czark Dep) at 36:18-37:12. Two officers are required to transport arrestees to that location. ¶ 14. One additional officer was required to take the photograph. Ex. 8 at 37:13-38:20. In fact, an officer would have to take time away from their responsibilities at Central Booking to devote time to taking an uncovered photograph. Ex. 8 at 39:15-19. Moreover, where an individual refuses to remove a head covering even at a separate location, the NYPD's policy was to "wait the defendant out…until such a time they change their mind." Ex. 8 (Czark Dep.) 43:4-15; *see also* ¶ 16. The City does not claim that permitting arrestees to retain their religious head coverings for photographs would burden guards, other

arrestees, or prison resources. Allowing an arrestee to maintain their religious head covering is plainly less resource- and time-intensive than waiting indefinitely until they comply with the City's demands.

The Policy's alternative—travel to One Police Plaza—is still more burdensome than allowing a photograph with a head covering.

As an initial matter, the City's travel "accommodation" was meaningless for religious head coverings worn separate from gender or privacy considerations. The class consists of all persons who were required to remove their religious head coverings for post-arrest photographs under the Policy. Dkt. 157 at 1, 11. And both experts testified that individuals are harmed from forced removal of religious head coverings even when they are worn for reasons separate from modesty or privacy. *See* Ex. 3 at 1 ("Coerced removal interferes with an individual's religious practice in multiple ways, including preventing their participation in rituals, taking away a method of forming and expressing religious identity, and impeding a means of moral training. The harm is best characterized as a type of what American philosopher Joel Feinberg terms 'profound offense' because it is a core trauma to a religious practitioner's sense of self."); Ex. 5 at 4-5 (acknowledging the "general harm of being forced to remove a marker of one's religious identity and commitments" as an injury separate from the bodily violation of forcibly removing a head covering worn for modesty.).

Moreover, the Policy's alternative was more resource-intensive as it protracted the processing time for arrestees. The Policy acknowledged this burden as it specifically states that officers were to inform the arrestee that their "arrest processing may be delayed" if the arrestee refused to remove their religious head covering. *See* Ex. 1 at 2. And class members' injuries go beyond the forced removal of their head coverings for the time of their booking photos because

19

they continue to suffer the adverse effects of the city's retention and distribution of uncovered photographs. *See supra* Part I.A.

### D.    Allowing Plaintiffs to Retain Their Head Coverings Would Further the City's Interest

Finally, as this Court previously noted, maintaining an arrestee's religious head covering for photographs furthers the City's interest in maintaining an accurate record by photographing the arrestee as they ordinarily appear. Dkt. 177 at 14-15. This readily available alternative is both effective and would further the City's objectives. The proof is apparent from other similar state and federal institutions where the interests in identification are the same, if not more, profound. The United States Department of State, the United States Citizenship and Immigration Services, and the Department of Motor Vehicles all allow religious head coverings in photographs used for identification without issue. *See* Dkt. 177 at 15. And other police departments allow arrestees to wear religious head coverings for booking photographs. *See id.*

Because there is no material dispute of fact that the City's Policy did not further any legitimate governmental interests and it directly impeded class members' religious exercise where ready accommodations could be made, the Policy fails rational basis review and summary judgment should be granted with regard to liability under the Free Exercise Clause.

## III.    THE POLICY VIOLATED THE NEW YORK STATE CONSTITUTION

The Policy violates Plaintiffs' "free exercise and enjoyment of religious profession and worship" where the Plaintiffs have a private right of action. N.Y. Const. Art. 1, § 3.

### A.    The Policy Violates Article I, Section 3

For all the reasons outlined above, *see supra* Part II.B, the Policy violated the New York State Constitution. Here, the Policy constituted an unreasonable interference with class members' religious freedom without serving a legitimate City interest. *See Ackridge v. Aramark*

*Corr. Food Servs.*, No. 16 Civ. 6301, 2018 WL 1626175, at *22 (S.D.N.Y. March 30, 2018) (finding violation of Article I, Section 3 "[f]or the same reasons the Court found the allegations sufficient to state a violation of Plaintiff's Free Exercise rights for the delay in receipt of kosher meals and lack of regular Jewish religious services").

Moreover, as this Court observed, "New York's free exercise clause is 'more protective of religious exercise' than its federal counterpart." Dkt. 177 at 18. Some courts have even applied a standard akin to strict scrutiny under the New York State Constitution, acknowledging "the New York Court of Appeals' long history and commitment to the protection of individual rights and liberties beyond those afforded by the U.S. Constitution, and Federal constitutional law." *Seabrook v. City of New York*, No. 99 Civ. 9134, 1999 WL 694265, at *6 (S.D.N.Y. Sept. 7, 1999) (quoting *Rourke v. New York State Dep't of Correctional Servs.*, 159 Misc. 2d 324 (Sup. Ct. Albany Cnty. 1993)); *In re Miller*, 684 N.Y.S. 2d 368 (4th Dep't 1998). These courts ask (1) whether the party has established that a government action has substantially burdened a sincerely held religious belief and (2) whether the State has demonstrated that the government action serves a *compelling* state interest, pursued by the least restrictive means, and that the interest would be "adversely affected" by granting an exemption. *Seabrook*, 1999 WL 694265, at *6.

For the same reasons described above in Part II.B, the Policy substantially burdened class members' sincere religious beliefs by forcing them to remove a religious head covering.

Moreover, the Policy did not serve a legitimate state interest under the Free Exercise Clause, let alone a *compelling* one under RLUIPA, *see supra* Parts I.B(1); II.B. This is *not* a case where individuals must remove a religious head covering to adhere to safety standards. *See Seabrook*, 1999 WL 694265, at *7 (considering a case where the Navy's safety interest in wearing helmets was compelling enough to warrant the removal of a Sikh turban). Nor is this a

21

case where Plaintiffs refused to have their photograph taken entirely. *See In re Miller*, 684

N.Y.S. 2d at 161 (upholding under New York state law a requirement that applicants take a

photograph for gun permits despite objections by the plaintiff against allowing himself to be

photographed). The City does not argue that removal of a religious head covering for arrest

photos served such serious safety interests.

And the Policy fails even under the more deferential "balancing test" afforded by other

courts. For example, the *Catholic Charities* court balanced the interest advanced by the policy

against the burden posed to religion. *Catholic Charities of Diocese of Albany v. Serio*, 7 N.Y. 3d

510, 525 (2006). While acknowledging that even in less extreme cases, parties could show that

the State has unreasonably interfered with their religious rights, the court considered hypothetical

laws such as "a general prohibition of alcohol consumption," interfering with the Christian

sacrament of communion or "uniform regulation of meat preparation" which would interfere

with kosher slaughterhouses as regulations that would be "well beyond the bounds of

constitutional acceptability." *Id.* at 527. Here, the City's Policy was akin to even these more

extreme scenarios. The City imposed a uniform ban on religious head coverings and, with no

exceptions, took and retained photos of uncovered individuals, unreasonably interfering with the

sincere religious practice of class members who wore those head coverings. The court in

*Catholic Charities* held that the policy requiring that plaintiffs provide prescription drug

coverage for contraceptives did not place a serious burden on their religious practice because it

did not "literally *compel* them to purchase contraceptive coverage for their employees, in

violation of their religious beliefs." *Id.* But here, Plaintiffs were *compelled* to remove their

religious head coverings, in direct violation of their religious beliefs.

The Policy does not further a compelling or legitimate interest in identification where, as explained above, an uncovered photograph would not reflect a class member's ordinary appearance, where other similar institutions permit religious head coverings with the same if not more serious interests in identification, and where, as this Court previously noted, "photographing the arrestee in her ordinary appearance [wearing religious head coverings] likely *furthers* law enforcement's interest in identification—rather than impeding such an interest— because arrestees who have a sincere religious belief that requires them to wear a head covering are likely to be wearing that same covering when the need to identify them arises." Dkt. 177 at 15.

### B.    A Private Right of Action is Necessary to Protect Plaintiffs' Rights

The New York State Constitution includes a private right of action where it is "necessary to effectuate the purpose of the constitutional protections the plaintiff invokes" and "appropriate to ensure full realization of [plaintiff's] rights." *Soliman v. City of New York*, No. 15 Civ. 5310, 2017 WL 1229730, at * 8 (E.D.N.Y. Mar. 31, 2017).

In this case, the New York State Constitution is "more protective of religious exercise" than the Federal Constitution. *Catholic Charities,* 7 N.Y. 3d at 525; *see also Town of Islip v. Caviglia*, 141 A.D. 2d 148, 161 (2d Dep't 1988). Relief under the federal constitution is thus not an adequate alternative remedy to a cause of action under Art. I, § 3.

Regardless, as this Court correctly observed, "[t]here appears to be no 'basis in New York law to deny a right of action under the New York Constitution based on remedies that may be obtained under *federal* law." Dkt. 177 at 17 (quoting *Soliman*, 2017 WL 1229730, at *9 (emphasis in original)); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 593 (S.D.N.Y. 2013) (concluding defendants violated Art. 1, Sec. 3 and implicitly assuming a private right of action exists); *Ackridge,* 2018 WL 1626175, at *22

23

(denying motion to dismiss Art. I, Sec. 3 claim and implicitly assuming a private right of action

exists). This Court has observed the same. "The New York Constitution creates rights and

protections that are independent from the rights and protections afforded under federal law." Dkt.

177 at 17 (citing *Immuno AG. v. Moor-Jankowski*, 77 N.Y. 2d 235 (1991)).

## CONCLUSION

Given the absence of disputes of fact concerning the Policy or its application, summary

judgment on liability should be granted for Plaintiffs' claims sounding in RLUIPA, and the

federal and state Constitutions.

Dated: September 5, 2023
      New York, New York

                                   EMERY CELLI BRINCKERHOFF
                                   ABADY WARD & MAAZEL LLP

                                             /s/

                                   Matthew D. Brinckerhoff
                                   O. Andrew F. Wilson
                                   Sana Mayat
                                   600 Fifth Avenue, 10th Floor
                                   New York, New York 10020
                                   (212) 763-5000

                                   SURVEILLANCE TECHNOLOGY
                                   OVERSIGHT PROJECT
                                   Albert Fox Cahn
                                   David Alfasi Siffert
                                   c/o Urban Justice Center
                                   40 Rector Street
                                   Ste 9th Floor
                                   New York, N.Y. 10006
                                   (646) 602-5600

                                   *Attorneys for Plaintiffs*