UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMILLA CLARK and ARWA AZIZ, on Behalf of Themselves and Others Similarly Situated, and TURNING POINT FOR WOMEN AND FAMILIES,<br><br>                    Plaintiffs,<br><br>     -against-<br><br>CITY OF NEW YORK,<br><br>                    Defendant. | Case No.: 18-cv-02334 (AT)(KHP)<br><br>**DECLARATION OF O. ANDREW F. WILSON** |

O. ANDREW F. WILSON, an attorney duly admitted to practice in the Southern District of New York, declares under penalty of perjury:

1.      I am a partner at Emery Celli Brinckerhoff Abady Ward & Maazel LLP ("ECBAWM"), attorneys for the Plaintiffs in above-captioned matter.

2.      I respectfully submit this declaration in support of Plaintiffs' Motion for Final Approval of the class action settlement agreement (the "Settlement Agreement") which is attached as Exhibit 1, and to ask the Court to enter the proposed final approval order, attached as Exhibit 2.

3.      As detailed in our prior submissions to the Court, Defendant has agreed to pay a settlement award to each person who had their religious head covering removed by the New York Police Department ("NYPD") for an official NYPD booking photograph during the "Class Period", who files a claim. The payment amount will range from $7,824 to $13,125 depending on the participation rate. The "Class Period" is defined as March 16, 2014, to August 23, 2021.

4.      Because the proposed settlement satisfies all of the criteria for final approval, Plaintiffs respectfully request that the Court:

a.  approve the April 4, 2024 Settlement Agreement, attached as Exhibit 1;

b.  approve attorneys fees and costs in the amount of $4,147,460; and

c.  approve service awards for the named plaintiffs Jamilla Clark and Arwa Aziz (the "Named Plaintiffs") of $35,000 each; and

d.  approve service awards for the seven class members who were deposed as part of absent class discovery in amounts ranging from $3,500 to $7,000, totaling $45,500.

**Background**

5.  Before filing the Complaint, Class Counsel thoroughly investigated the underlying claims and collected significant factual information through research, including detailed interviews of the Named Plaintiffs about their experiences, extensive legal research concerning the novel application of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") to advance claims for removal of religious head coverings, retention of an expert to explore the nature and basis of head covering practices across different religions, and research concerning national standards regarding religious head covering.

6.  The Complaint was filed against the City on March 16, 2018 by Named Plaintiffs Jamilla Clark and Arwa Aziz, on behalf of themselves and a putative class. Dkt. 1. They alleged the removal of religious head coverings for booking photographs violated RLUIPA, the First Amendment to the United States Constitution, and the New York State Constitution.

7.  Named Plaintiffs sought to represent a class of individuals who were forced to remove a religious head covering for an official NYPD booking photograph during an arrest. The Named Plaintiffs sought declaratory and injunctive relief as well as monetary damages along with all other members of the putative class.

8.      Two years later, the parties entered a partial settlement that has fundamentally

changed the way the NYPD treats people who wear religious head coverings. Dkt. 148; 148-1.

The NYPD changed its policy and adopted Patrol Guide Procedure No. 208-83 ("New Policy")

which remains in effect today. The New Policy permits all arrestees to retain their religious head

covering unless they fall within limited exceptions where specific evidence would be obscured

by a head covering or a person was arrested outside of their home without a head covering.

**Motion Practice**

9.      Plaintiffs moved for class certification and the City opposed the motion. Dkt. 134;

Dkt. 142. This Court, on February 16, 2021, certified a class consisting of all persons who were

required to remove their religious head coverings for post-arrest photographs under the NYPD's

prior policy. Dkt. 157 at 1, 11.

10.      The City filed a motion to dismiss the complaint on June 13, 2018, challenging

whether Plaintiffs had standing to pursue injunctive or declaratory relief; whether Plaintiffs

alleged a constitutional violation; whether Plaintiffs possessed a claim under state law; and

whether the City of New York is immune from punitive damages. Dkt. 22. Plaintiffs opposed the

motion to dismiss. Dkt. 31. In a decision dated September 17, 2021, the Court denied the City's

motion to dismiss. Dkt. 177.

**Discovery and Information Exchange**

11.      During discovery, Class Counsel diligently pursued all information relevant to

establishing Plaintiffs' claims, propounding numerous rounds of discovery requests and

reviewing documents Defendant produced. Class Counsel's discovery requests sought relevant

policies, practices, and directives of the NYPD; photographs of thousands of class members; and

documentation regarding instances of religious head covering removal and retention of photographs.

12.     Class Counsel took two Rule 30(b)(6) depositions of Defendant City of New York. The depositions sought evidence of Defendant's policies, practices, and training regarding the forced removal of religious head coverings and the retention of photographs. Class Counsel also conducted expert discovery regarding the various religious practices of head covering. Class Counsel retained an expert to prepare a report, reviewed Defendant's expert report and conducted a deposition of Defendant's expert.

13.     The Parties also engaged in extensive meet-and-confers regarding discovery in this case and sought the Court's intervention on numerous occasions. Class Counsel opposed Defendant's motion for absent class discovery twice. When the Court ultimately granted Defendant the opportunity to conduct absent class discovery, Class Counsel expended additional effort to contact 550 class members. Class Counsel fielded phone calls from class members and enlisted a class administrator to find accurate contact information to facilitate communication. Class Counsel prepared and defended seven class member depositions.

**Negotiation of the Settlements**

14.     After being referred to mediation on April 5, 2021, Dkt. 165, the parties engaged in extensive negotiations before a Court-appointed mediator for seven months before negotiations broke down in November 2021. The parties resumed mediation before Magistrate Judge Parker on September 26, 2023 and November 20, 2023. While settlement negotiations were underway, Class Counsel moved for partial summary judgment on liability and completed briefing before the November 20, 2023 mediation to establish the merits of the case and inform Plaintiffs' settlement position. Dkt. 306, Dkt. 321.

15.      For purposes of settlement negotiations, Class Counsel assembled a chart reflecting a common fund settlement structure that would yield a recovery for each class member depending on the participation rate and after fees and costs were deducted.

16.      By December 1, 2023, the Parties had reached an agreement in principle as to the $17,500,000 common fund with $4,375,000 set aside for incentive payments, attorneys' fees, and administrative costs. The Parties continued to meet from November 2023 to March 2024, to negotiate the precise terms of the Settlement Agreement.

17.      The City provided a Class List of all individuals who had a religious head covering removed for an official NYPD booking photograph according to its electronic records. The Parties conferred regarding the Class List and agreed that individuals on the Class List would be presumptively considered part of the Settlement Class and eligible for a settlement award. Such people would not be required to submit proof of removal of a religious head covering. An individual not on the Class List may submit a claim following the instructions set forth in the Settlement Agreement. The Parties will work together in good faith to determine whether such a claim has merit.

18.      The Parties also negotiated several other key terms of the Settlement Agreement. For example, Class Counsel successfully negotiated and obtained an agreement from Defendant to limit liens and judgments that the City could deduct from Class Members' monetary awards. The Parties also negotiated details regarding the Claims process, including identification requirements for Class Members, the timing of the Claims Period and a process for late claims.

19.      On April 4, 2024 the Parties ultimately reached an agreement on all terms of a settlement agreement, which was executed on April 4, 2024, attached hereto as Exhibit 1.

**Main Terms of Settlement Agreement**

20.    Defendant agreed to a Class Fund of $17,500,000 for all Class Member claims, service awards for the Class Representatives and certain Class Members, Administrative Costs, and Class Counsel's own past, present, and future fees and costs. The "Settlement Costs" will be the amount of four million, three hundred and seventy-five thousand dollars ($4,375,000) set aside from the Class Fund for incentive payments, attorneys' fees, and administrative costs. The "Distribution Amount" will be the amount of thirteen million, one hundred and twenty-five thousand dollars ($13,125,000) from the Class Fund which is the total amount available to distribute to Class Members who file claims. The Distribution Amount will be allocated based on the number of Claimants such that every Claimant receives the same amount for each instance of removal.

21.    The Distribution Amount of $13,125,000 will be allocated based on the number of Claimants such that every Claimant receives the same amount. This will be determined as follows: (1) if the percentage of Incidents for which Class Members submit claim forms is 20% or greater, up to and including 40%, then the Distribution Amount shall be divided equally amongst all Claimants; (2)  if the percentage of Incidents for which Class Members submit Claim Forms is greater than 40%, the City shall supplement the Class Fund and the Distribution Amount such that each Claimant receives $7,824 for reach instance of removal; and (3) if the percentage of Incidents for which Class Members submit Claim Forms is less than 20%, then all Claimants shall receive $13,125 and the remaining amount in the Class Fund shall be returned to the City.

22.    Any Class Member whose religious head coverings were removed for an official NYPD booking photograph on more than one occasion during the Class Period is entitled to

payment for each instance and their settlement will be calculated by multiplying the recovery amount by the instances of release during the Class Period.

23.     The timeline of the settlement administration and payment of timely and valid claims by Class Members is structured as follows:

     a.   No later than May 29, 2024, the Administrator would mail the Claim Packet to all Class Members.

     b.   Not later than September 26, 2024, Class Members must file timely and valid claims, requests to be excluded ("opt-out") from the Class, or file objections to the settlement (120 days from the date on which claim packets are mailed).

     c.   Not later than October 14, 2024, any motions seeking final approval of the proposed Settlement and any application for attorneys' fees and expenses must be filed and served.

     d.   The Fairness Hearing was scheduled for October 29, 2024.

24.     The Settlement further provides that Defendant will pay the full amount of timely and valid claims to the Administrator not later than 60 days following the entry of the Court's Final Approval (the "Effective Date of Payment"). The Administrator will then distribute the Class Members' settlement awards by check.

25.     Class Members are permitted to file "untimely" claims. Class Members will receive a settlement award as long as the Class Member can establish good cause for submitting an untimely claim and the Administrator receives the untimely claim within 30 days of the Final Claim Form Deadline.

26.     Claims belonging to deceased Class Members will be payable to the legally and duly appointed representative, administrator, or similar legal successor of their estate. The

representative of the Class Member's estate must provide a proof of death and appropriate documentation to show that they are properly a representative of the estate. They are permitted to submit a claim based on the information known by the representative.

27.     The Settlement allows Class Counsel to apply for an award of attorneys' fees and costs. Class Counsel's fees and costs will not be deducted from any settlement payments to Class Members, although the benefit to the Class will be a factor in Class Counsel's fee application. The City has agreed to pay Class Counsel the attorneys' fees and costs in the amount remaining after administrative costs and incentive awards are deducted from the Settlement Costs, which are $4,375,000. The City will not object to the attorneys' fees application.

28.     Under the Settlement, Rust Consulting, Inc. ("Rust") has served as the Settlement administrator ("Administrator").

29.     The Settlement required a detailed notice program, which consisted of several components as detailed further below. Direct notice to Class Members consisted of sending by first-class mail to each Class Member a cover letter and a claim form (together, a "Claim Packet"), as well as sending an email and making phone calls to Class Members for whom email addresses and phone numbers were available. Notice also included publication and outreach to spaces where Class Members would see notice of the Settlement.

30.     Named Plaintiffs Jamilla Clark and Arwa Aziz have expressed their approval of the settlement by agreeing to the Settlement Agreement. In accordance with the Settlement Agreement, Plaintiffs request that the Court approve service awards for the Named Plaintiffs in the amount of $35,000 each and between $3,500 and $7,000 for the Class Members who were deposed as part of absent class discovery, in recognition of the services they rendered on behalf of the class, as further detailed below.

**Fairness of the Settlement**

31.     As discussed in more detail in the accompanying memorandum of law, the

Settlement Agreement represents an extraordinary outcome given the attendant risks of litigation.

32.     Defendant agreed to settle this case for a substantial amount: $17,500,000 for all

Class Member claims, service awards for the Class Representatives and certain Class Members,

Administrative Costs, and Class Counsel's own past, present, and future fees and costs.

33.     The structure of the Settlement Agreement allows each Class Member to be

eligible for the same settlement award for each instance of removal if they submit a claim form.

34.     While some Class Members may have had their religious head coverings removed

for longer or may have been particularly traumatized by the removal, most Class Members do

not possess the documentation necessary to show that their religious head covering was removed

for an official photograph during the Class Period. The Settlement Agreement allows for a more

streamlined and structured identification process for the Parties and puts less burden on the Class

Members to produce documentation they may not actively have access to.

35.     This settlement amount represents a substantial value to Class Members given the

attendant risks of litigation, though recovery could theoretically be greater if Plaintiffs succeeded

on a motion for summary judgment; succeeded on all claims at trial; survived an appeal; and

were able to collect on the judgment they obtained.

36.     The settlement makes this monetary relief available to Class Members in a prompt

and efficient manner, unlike continuing litigation.

37.     As of October 7, 2024, 524 Class Members have filed timely, valid claims,

representing 16% of the total instances of removal of religious head coverings; this number is

expected to rise as certain deficient claims are corrected and valid untimely claims are accepted.

The claim or return rate outstrips the average return rate; the vast majority of class action settlements offering monetary benefits receive claims from under 10% of Class Members.

38.    The monetary award is a substantial value to Class Members given the attendant risks of litigation. Even if Plaintiffs succeed on summary judgment, a fact-intensive trial would likely be necessary to determine damages. A trial on the merits would involve significant risks for Plaintiffs as to damages. A trial would be lengthy and complex, would require extensive testimony from expert witnesses, and would consume tremendous time and resources for the Parties and the Court. While Plaintiffs believe that they could ultimately establish damages, this would require significant factual development, requiring hundreds of additional hours of discovery, plus the time and resources required to litigate dispositive motions and prevail at trial, and then prevail again on the inevitable appeal.

39.    Defendants could also move to decertify the class and have repeatedly noted their intention to do so or win a dispositive pre-trial motion or obtain favorable verdict at trial—in those situations Class Members would be left with no relief at all. Even if Plaintiffs win a favorable verdict and an award of damages, the verdict or damages award could be reversed or reduced on appeal.

40.    Further, the Settlement Agreement limits the amount that Defendant can withhold from Class Members' settlement payments for liens and judgments. Some Class Members may have outstanding child support obligations, or other liens and charges owing to New York City or to New York State. In light of the nature of this settlement, which is intended to compensate individuals for the unconstitutional harm they have suffered, the Parties agreed that the City would only consider reducing payments to Class Members in two circumstances: for documented

child support liens with relevant due process protections, and for up to $500 per Class Member in docketed judgments for parking violations.

41.     This settlement provides immediate relief. Without a settlement, Class Members would not obtain relief for years.  This settlement represents a significant percentage of the best possible recovery.

42.     The Named Plaintiffs have fairly and adequately protected the interests of the classes and have no conflict with any class members. Class Counsel, including myself, have spoken to the Named Plaintiffs repeatedly. They fully understand the significance of their roles as class representatives, including their duties of loyalty to the interests of all absent class members, and their responsibilities to fully cooperate with the vigorous prosecution of this case.

**Fairness of Service Awards**

43.     The $35,000 service awards to the Named Plaintiffs and between $3,500 and $7,000 to Class Members who participated in discovery are also fair. Named Plaintiffs contributed significant time and effort to the investigation and prosecution of the case by providing Class Counsel with detailed factual background regarding their experiences in NYPD custody, including Defendant's removal of their religious head coverings for booking photographs.

44.     Named Plaintiffs participated for almost six years in active litigation, assisted with discovery, communicated regularly with Class Counsel, provided documents and information to Class Counsel, and, in the interest of the case, publicized their personal experience where the NYPD forcibly removed their religious head coverings for booking photographs. Both Named Plaintiffs were deposed for several hours, during which they were interrogated regarding their personal religious practices and details regarding their arrest

45.    Plaintiffs approved the Settlement and made themselves readily available to communicate with Class Counsel during the settlement conference. They also chose not to pursue settlement of their individual claims against the City, which likely would have yielded a far quicker settlement, in order to continue their service as Named Plaintiffs and advocate for damages for the entire class of individuals affected by the City's unlawful practices towards religious head coverings. The time and effort contributed by the Named Plaintiffs for the benefit of the class and the additional burdens they sustained support the requested service award.

46.    Similarly, absent class members undertook reputational risk because their uncovered photographs were viewed by both parties and their personal and private religious practices were scrutinized by Defendants during depositions that lasted between 1-2 hours. At least two absent class members who were deposed were brought to tears by Defendants' questioning, demonstrating the emotional impact and the significant reputational risk each class member undertook by participating in depositions.

**Administration and Provision of Notice**

47.    After the Settlement was signed on April 4, 2023, the Parties worked to implement the many provisions of the agreement. Together with Rust and the City's counsel, Class Counsel reviewed multiple drafts of the claim form, short-form notice, long-form notice, cover letter to Class Members for mailed direct notice, and email notice to Class Members. Class Counsel spent considerable time advising on the design of these forms, as well as the claim packet, to ensure that they were concise and in plain language, and requested only the minimum amount of information needed to validate a claim. I believe that the clarity and simplicity of these forms contributed to the high return rate in this case.

48.    Class Counsel prepared and filed a motion for preliminary approval of the Settlement, together with the finalized forms of direct notice to Class Members.

49.    By an order dated April 29, 2023, the Court approved the plan for administration, claim form, and notice program. See Dkt. 344.

50.    The parties have complied with that order. The details of the steps the parties have taken to implement the notice program are set forth in the accompanying declaration of Jason Stinehart, Program Manager of Rust.

51.    I and others at this office worked closely with Rust to ensure proper implementation of the notice program and proper administration of the Settlement.

52.    After the Settlement was preliminarily approved, the Parties worked with Rust to review, edit, and finalize English, Spanish, Arabic, Bengali, Hebrew, Punjabi, and Urdu versions of the long-form notice to Class Members.

53.    Class Counsel also worked with Rust to create the content for a website for the settlement, www.headcoveringcase.com, including a list of frequently asked questions. Class Counsel worked with Rust to create an online claim form that would be easily accessible and understandable to Class Members. Class Counsel provided Rust with key documents about the lawsuit and Settlement to be posted on the website. Class Counsel spent significant time reviewing the draft website and testing the online claim form.

54.    Rust also provided telephone support to Class Members through a dedicated toll-free number. Class Counsel spent significant time reviewing and editing the script that customer service representatives ("CSR") used when speaking with callers and the content of the pre-recorded information available to callers after business hours. Class Counsel worked with Rust to

use the Rust call center to ask how claimants learned of the Settlement, the results of which could be used to tailor the second "wave" of the media plan.

55.     Class Counsel spent significant time working with Rust to review and finalize the content for publication notice. Class Counsel reviewed and edited the text and visual presentation of advertisements in the Jewish Press, DesiTalk, Weekly Bungalee, Punjab Times, and Urdu Times and obtained media coverage in the New York Times, Associated Press, Reuters, CBS News, U.S. News, amongst other major outlets. Class Counsel developed flyers to distribute at legal aid organizations, advocacy organizations, and religious houses of worship. Per our suggestion, a QR code was included on much of the printed material in order to allow interested individuals to scan that code on an electronic device and be taken directly to the settlement website.

56.     Class Counsel worked closely with the City's counsel and Rust to compile information about the Class Members to identify the best address and contact information for the class among numerous City and State data sources. The City provided Class Counsel and Rust with the City's Class List along with mailing address, email address, and phone numbers within the NYPD records for people on the Class List.

57.     As set forth in more detail in the Stinehart Declaration, Rust performed its own searches to determine which address was the best match for each Class Member.

58.     Rust issued direct notice to the class by mailing the Claim Packet to Class Members and other individuals who had requested a claim form. Coinciding with the issuance of direct notice, the online claim form went live. The "first wave" of publication notice and the media plan also began at this time, as detailed in the Stinehart Declaration.

59.     This office contacted organizations providing and overseeing the provision of criminal defense representation to indigent individuals: the Legal Aid Society, Bronx Defenders, Brooklyn Defender Services, Queens Defenders Services, Neighborhood Defender Services, Office of the Appellate Defender, New York County Defenders Services, Decarceration Project, and the Center for Appellate Litigation. We shared the summary notice with these organizations so that they could contact their clients who were likely to be Class Members. Pursuant to Paragraph 68 of the Settlement, and after agreement with Defendant's counsel and execution of the protective order by the relevant individuals, Class Counsel provided certain criminal defense organizations data about their own clients who were on Class List so that they could facilitate notice to these Class Members.

60.     We also contacted grassroots and community organizations that were likely to reach Class Members such as: the Arab American Association, the Yemeni American Merchants Association, the 92nd Street Y, the Muslim Community Network, Jews for Racial and Economic Justice, African Communities Together, the Sikh Coalition, the Jewish Federation of New York, and the Council on American Islamic Relations.

61.     Finally, this office contacted religious centers of worship across New York City, including gurudwaras, mosques, and synagogues, engaging with trusted community leaders who could better spread notice about the settlement to their congregations and communities.

62.     Halfway through the claims period, Class Counsel instructed Rust to run enhanced searches at an added cost to find accurate addresses for 704 Class Members—many for whom the notice was returned as "undeliverable."

63.     Our office also conducted a significant amount of outreach by email and telephone directly to individual Class Members. Our office made individual, direct calls to over

800 Class Members based on contact information obtained from the City, Rust, and the Legal Aid Society.

64.     Our office also sent reminder letters—at an added cost—on an ECBAWM letterhead, signed by myself, to Class Members who had not yet filed a claim and advised them of the claim submission deadline. Rust recommended that a letter from Class Counsel, on law firm letterhead, could alleviate potential concerns of fraud or identity theft.

65.     Rust sent reminder postcards by mail to Class Members that had not yet filed a claim. Class Counsel reviewed and edited all of these communications to Class Members.

66.     Class Counsel conferred with the City's counsel regarding individuals who stated that they were class members but were not listed on the City's List. The City provided additional information regarding these individuals and Class Counsel spent significant time reviewing this information and gathering additional information to determine whether these individuals are Class Members.

67.     As the deadline for timely claim submission approached, this office worked with Rust to alter the website, online claim form, and hard copy claim form to facilitate the submission of untimely claims in accordance with the Settlement. Under the Settlement, Rust can accept untimely claims filed by Class Members that establish "good cause" for the late submission. Those reasons are defined as, without limitation, the illness or death of a Class Member or member of Class Member's family, the incarceration or detention of a Class Member, or the failure to receive a notice packet, mailing or technical issues generally, including without limitation undelivered claim forms, technical difficulties or problems with uploading the claim, problems with tickler or reminder systems and translation issues. The revised online and

hard copy claims forms are fashioned so that Class Members understand that they must identify a reason for the untimely claim submission.

68.    Throughout the Settlement administration, this office has worked closely with Rust to respond to any Class Member questions as well as other administration issues that arose. This office also has directly responded to hundreds of inquiries from Class Members by mail, email, and telephone calls received at this office. Class Counsel responded to all letters forwarded by the Court.

69.    The response to the Settlement has been positive. As of October 7, 2024, approximately 524 claims have been determined to be from Class Members.

70.    Class Counsel will continue to work with Rust and the City's counsel on settlement administration issues in the coming months. Class Counsel will not only review and respond correspondence from individuals who assert they are Class Members, but also will continue responding to the numerous questions it receives regarding the Settlement's terms, eligibility, check issuance and cashing, untimely claim filing, and other issues. Class Counsel will also need to discuss with the City whether parking judgments liens will be deducted from the Class Members' settlement awards, and will likely field inquiries regarding deductions for child support liens.

71.    The Parties and the Administrator will continue to work together to ensure a smooth processing of the claims process and will provide updated information prior to the Fairness Hearing, which is scheduled for October 29, 2024.

**Objections or Exclusions**

72.    To date, no objections have been filed. Only one Class Member filed an exclusion request.

**Attorneys' Fees and Costs**

73.     The Settlement allows Class Counsel to apply for an award of attorneys' fees and costs. Class Counsel's fees and costs will not be deducted from any settlement payments to Class Members, although the benefit to the Class will be a factor in Class Counsel's fee application. The City has agreed to pay Class Counsel the attorneys' fees and costs in the amount remaining after administrative costs and incentive awards are deducted from the Settlement Costs, which are $4,375,000. The City will not object to the attorneys' fees application.

74.     Class Counsel seeks an award of attorneys' fees and costs of $4,147,460 which represents almost 24% of the total Settlement Amount.

75.     As indicated in the below chart, the current lodestar for ECBAWM is 1,290,204.00. While Class Counsel litigated this case on a contingency basis, the hourly attorney rates used in calculating the lodestars for ECBAWM are rates the firms charge clients who pay our firm on an hourly basis.

**Calculated Lodestar for ECBAWM**

| INDIVIDUAL | HOURS | RATE | TOTAL |
|---|---|---|---|
| Andrew Wilson | 740.1 | $650.00-$775.00 | $507,282.50 |
| Emma Freeman | 697.30 | $500.00 | $348,650.00 |
| Sana Mayat | 587.25 | $450.00-$500.00 | $282.401 |
| Matthew Brinckerhoff | 28.00 | $825.00 | $23,100.00 |
| Francesca Cocuzza | 38.10 | $450.00 | $17,145.00 |
| Katherine Rosenfeld | 3.70 | $650.00 | $2,405.00 |
| Richard Emery | 1.80 | $950.00 | $1,710.00 |
| Elizabeth Saylor | 2.40 | $550.00-$600.00 | $1,330.00 |
| Zoe Salzman | 1.90 | $550.00 | $1,045.00 |
| Andrew Jondahl | 2.10 | $475.00 | $997.50 |
| Doug E. Lieb | 2.70 | $365.00 | $985.50 |
| Ashok Chandran | 2.50 | $365.00 | $912.50 |
| Debbie Greenberger | 4.50 | $600.00-$750.00 | $3,135.00 |
| Diane Houk | 1.20 | $700.00 | $840.00 |
| Max Selver | 2.60 | $450.00-$525.00 | $1,260.00 |
| Emily Wanger | 1.40 | $450.00 | $630.00 |
| Alanna Kaufman | 1.20 | $390.00 | $468.00 |
| Dan Eisenberg | 1.90 | $550.00-$575.00 | $1,070.00 |
| Daniel Kornstein | 0.10 | $900.00 | $90.00 |
| David Lebowitz | 0.10 | $365.00 | $36.50 |
| Ariadne Ellsworth | 0.50 | $475.00 | $237.50 |
| Eric Abrams | 0.80 | $500.00 | $400.00 |
| Laura Kokotailo | 0.40 | $500.00 | $200.00 |
| Paralegals | 314.6 | $170.00-$225.00 | $66,798.00 |
| Summer Associates | 124.5 | $170.00-$260.00 | $27,075.00 |
| **Total** | **2,559.85** | | **$ 1,290,204.00** |

76.     The chart above illustrates the number of hours billed by each ECBAWM timekeeper, the timekeeper's hourly rate, a total for each timekeeper, and a total of all of the attorneys' fees ECBAWM has expended on this case.

77.     Specifically, as of October 3, 2024, ECBAWM billed more than 2,500 hours litigating this case.

**The Hours Expended and that Will Be Expended on This Case Are Reasonable**

78.     As described *infra*, the number of hours expended by Class Counsel is reasonable, especially in comparison to the extraordinary result achieved for Class Members. As a result of the significant time invested by Class Counsel in litigating the case, pursuing every avenue of success across six years, negotiating a monetary settlement with significant and favorable non-monetary settlement terms, diligently and creatively overseeing notice to the class, and ensuring that notices and claim forms would be easy to understand and simple to file, 524 Class Members submitted valid claims, resulting in a total monetary award of $8,163,750.00 as of October 7, 2024.

79.     I served as the primary partner working on this case from pre-filing investigation through discovery and settlement negotiation and during settlement administration. When the case was first being investigated and filed, as well as at key moments during discovery, settlement negotiations, and settlement administration, senior partner Matthew D. Brinckerhoff provided advice and expertise and reviewed critical documents in the case. In general, I worked with a single, more junior attorney at any given time on the daily litigation of the case—Emma Freeman when this case was first filed, to defend against the City's motion to dismiss, to move for class certification and during initial stages of discovery and the injunctive settlement; Francesca Cocuzza during further fact discovery; and Sana Mayat during further fact discovery,

to move for summary judgment, to finalize the settlement agreement, and to assist with administration of the Settlement. Eighteen other attorneys, listed above, billed small amounts of time to this case (totaling 31.8 hours) for tasks ranging from strategic discussions and client and settlement meetings to proofreading.

80.    All of this time was contemporaneously entered into our system. The attorneys at ECBAWM all record their time in all cases contemporaneously by typing into a computer program maintained by the firms for the purpose of tracking time and costs. The attorneys and staff record the date and total time spent on a given matter that date, the tasks performed for the matter, and the amount of time each task took. Time is billed in six-minute increments, or one-tenth of an hour.

81.    I have reviewed the time records documenting the time spent by myself and other ECBAWM attorneys on litigating this case and certify that the records reflect the work reasonably and necessarily performed by ECBAWM attorneys in connection with this case.

82.    Class Counsel has not submitted its detailed billing records containing descriptions of the work performed on the case because those entries contain information protected by attorney-client and attorney work product privileges. It would be burdensome to redact years of daily time entries of privileged information, and under authority in this circuit, such detailed review is not necessary or appropriate for an award of attorneys' fees based on a percentage or lodestar-plus-multiplier approach; we will provide such records, however, at the Court's request.

83.    As described further below, Class Counsel will continue to spend significant time and effort to ensure proper administration of the Settlement. Since the claim submission deadline of September 26, 2024, Class Counsel has spent approximately 40 additional hours reviewing

and analyzing claim validation issues, untimely claims, and Class Members' responses to requests for further information. We expect to expend hundreds more additional hours as the settlement administration continues.

**ECBAWM's Hourly Rates Are Reasonable and Standard in the Market**

84.     ECBAWM is a litigation boutique that focuses on civil rights, commercial, criminal, and attorney ethics matters. We represent individuals, businesses, and institutions in all aspects of litigation and pre-litigation dispute resolution, from negotiation, mediation and arbitration, through hearings, trials, and appeals.

85.     Attorneys and paralegals at ECBAWM maintain contemporaneous time records reflecting the time spent on this and other matters. Time spent on this matter was typed into a computer program directly by the timekeeper. The timekeeper indicates the date and amount of time spent on a task, describes the work that was performed during the specified period, and identifies the case to which the time should be charged.

86.     The primary ECBAWM attorneys who worked on this case are myself, partner Matthew Brinckerhoff, associate Sana Mayat and former associates Emma Freeman and Francesca Cocuzza. The primary paralegals working on this case are ECBAWM paralegals Dymond Wells and Carlos Martinez-Montes; former paralegal Eman Merghani also worked on the case. Other ECBAWM paralegals, associates, and partners provided occasional assistance and their time is also documented in our contemporaneous time records and the chart above.

87.     ECBAWM routinely charges and receives from its hourly clients: $950 per hour for Matthew D. Brinckerhoff, $775 per hour for me, $500 per hour for Sana Mayat, and the same rates for attorneys with comparable levels of experience and qualifications, as well as $225 per

hour for the work of paralegals. These rates have increased slightly since ECBAWM began

working on this case in 2017. The range of hourly rates is reflected in the chart above.

88.     All of the attorneys on this case have worked on cases in which clients retained us

and paid us and our paralegals on an hourly basis at these rates to pursue their claims, including

on commercial matters and on civil rights matters.

89.     Based on my knowledge of the New York City legal market, these are all

reasonable rates in light of the experience, expertise, and qualifications of these attorneys and

paralegals and the prevailing market rates for similarly qualified attorneys and paralegals in New

York City.

90.     ECBAWM handles approximately 50% contingency cases (mostly civil rights,

including sexual assault cases) and 50% hourly cases (consisting of employment, occasionally

civil rights, and mostly complex commercial cases). ECBAWM did not take this case on a pro

bono basis to give its attorneys experience or to improve its reputation. ECBAWM took this case

intending to recover fees if its client prevailed. ECBAWM would not be able to pay its attorneys,

support staff, and overhead costs if it did not prevail in the vast majority of its fee-shifting civil

rights cases.

91.     The requested rates are particularly reasonable because the risk of little or no

recovery in this case was very high at the time Plaintiffs filed this lawsuit. Had Class Counsel not

succeeded, we would have received no payment for our work.

92.     ECBAWM has been recognized by numerous judges for the quality of its civil

rights work. Courts have taken "judicial notice of [Emery Celli]'s high reputation, finding it to

be one of the most competent, successful, and reputable civil rights firms practicing in this

Court." *Wise v. Kelly*, 620 F. Supp. 2d 435, 445 (S.D.N.Y. 2008) (citation omitted).

93.     ECBAWM periodically reviews prevailing legal rates in the legal community of firms roughly comparable in size and having attorneys of similar skill, experience, and standing.

**Background and Qualifications of ECBAWM Attorneys**

O. Andrew F. Wilson

94.     I received my J.D. from the University of Toronto in 2000 and have been a partner at ECBAWM since 2005. I have more than twenty years of litigation experience, including handling class actions and other complex suits. For example, I litigated against the Yonkers Police Department to reform its treatment of religious head coverings and achieved a $6 million settlement with the City of New York as part of a wrongful conviction suit.

95.     Prior to joining the firm, I was an associate at Simpson Thacher and Bartlett LLP. I have also worked at Tory Tory DesLauriers & Binnington in Toronto, at the World Health Organization in Geneva, and at Profamilia Legal Services in Bogota. I clerked for the Honorable Harold A. Ackerman, in the District of New Jersey

Matthew D. Brinckerhoff

96.     Matthew Brinckerhoff is a founding partner at ECBAWM. He received his B.A. from Hampshire College and his J.D. from New York University School of Law in 1990. From 1990-1991, Mr. Brinckerhoff clerked for the Hon. Naomi R. Buchwald of the Southern District of New York. Following his clerkship, Mr. Brinckerhoff worked for South Brooklyn Legal Services, prosecuting government reform class actions and providing direct client representation to persons unable to afford legal counsel.

97.     Mr. Brinckerhoff specializes in complex litigation and class actions. He successfully represented a class of defrauded consumers, which settled for $60 million. *See Sykes v. Mel S. Harris & Assocs.*, 09 Civ. 8486 (S.D.N.Y.). He also represented a class of

approximately 60,000 people who were arrested for minor violations and then illegally strip-searched, which settled for $50 million. *See Tyson v. City of New York*, 97 Civ. 3762 (S.D.N.Y.). He currently represents a class of inmates who were illegally subjected to post release supervision by the Department of Corrections. *See Betances v. Fischer*, 11 Civ. 3200 (S.D.N.Y.).

98.    The other attorneys on this matter are also highly qualified. Sana F. Mayat, an associate at ECBAWM, graduated from the University of California, Berkeley, School of Law and has spent the last two years at the firm litigating a variety of civil rights cases and commercial matters. Before joining ECBAWM, she was a legal fellow at the American Civil Liberties Union. Emma Freeman, formerly an associate at ECBAWM, currently serves as an adjunct professor at the University of Minnesota Law School. Ms. Freeman graduated from Harvard Law School, *cum laude* in 2013 and has several years of litigation experience.

ECBAWM Paralegals

99.    ECBAWM paralegals worked over 300 hours on this case through October 2024.

100.    The primary paralegals assigned to this case were Dymond Wells, Carlos Martinez-Montes and former paralegal Eman Merghani. Other ECBAWM paralegals assisted on the case as needed for tasks such as cite-checking legal submissions.

101.    ECBAWM paralegals on this case keep track of their time using the same computer program that ECBAWM attorneys use as described above. Their time is summarized in the chart above.

102.    Paralegals assisted with discovery in this case, including downloading productions to our document management system, reviewing and retrieving documents and photographs of arrestees, and preparing exhibits and material for depositions. Paralegals Dymond Wells and Carlos Martinez-Montes spent significant time reviewing inquiries from

Class Members that our firm received by email, mail, and phone; responding to those inquiries with claim forms, notices, and other information about the Settlement and eligibility; and speaking with legal aid organizations and other stakeholders to raise awareness of the Settlement. Having paralegals perform these tasks helped reduce the fees, because it would have been more costly for ECBAWM attorneys to do them.

103.    I have reviewed the time records documenting the time spent by ECBAWM paralegals on assisting in the litigation of this case and certify that the records reflect the work reasonably and necessarily performed by the ECBAWM paralegals in connection with this case.

**The Costs Expended Are Reasonable, Necessary, and Compensable**

104.    ECBAWM paid a total of $39,431.23 in costs for Plaintiffs through October 3, 2024 that were necessary to the litigation of this case.

105.    The chart at the end of this declaration shows the costs incurred by Class Counsel to litigate this case. All of these costs were reasonable, necessary, and actually incurred.

106.    The costs sought by Plaintiff for ECBAWM are routinely charged by ECBAWM to its hourly paying clients in civil rights and commercial litigation.

107.    Those costs include the Court filing fees; process server fees; court reporting and transcript costs for the depositions and court hearings; e-discovery services (including collection of data, culling of data, and loading of documents produced by Defendant and third parties); Westlaw and LexisNexis charges for legal research; courier/Federal Express, photocopy; and late-night meals.

108.    The expert costs include retaining an expert to consult with during discovery, reviewing that expert's report regarding religious practice across religions, and preparing for the expert's deposition.

109.    The underlying invoices and receipts for each of the costs listed in the chart above are maintained at ECBAWM's offices and are available at the Court's request.

110.    I have reviewed the chart above and certify that it reflects the actual costs that were reasonably and necessarily incurred by ECBAWM in connection with this case.

### 111.    Class Counsel Expenses

| Category | Sum of Total Amount |
|----------|---------------------|
| Meals | $78.56 |
| Court Reporter | $3,390.39 |
| Discovery Management | $2,885.25 |
| Experts | $13,000.00 |
| Filing Fees | $400.00 |
| Legal Research | $18,118.91 |
| Mailing and Printing | $1,314.12 |
| Process Servers | $244.00 |
| **Grand Total** | **$39,431.23** |

**Conclusion**

112.    For the reasons stated above and in the accompanying Memorandum of Law, the Stinehart Declaration, and exhibits, we respectfully ask the Court to enter the proposed Preliminary Approval Order, attached as Exhibit 2.

Dated:  October 11, 2024
        New York, New York

_____
        /s/
        O. ANDREW F. WILSON